568 P.2d 1007 (1977)
KOBUK ENGINEERING & CONTRACTING SERVICES, INC., an Alaska Corporation, and R.W. Robinson, Appellants,
v.
SUPERIOR TANK & CONSTRUCTION CO-ALASKA, INC., an Alaska Corporation, Appellee.
No. 2983.
Supreme Court of Alaska.
September 9, 1977.
*1009 Edward L. Garnett, Kenai, for appellants.
Albert Maffei, Anchorage, for appellee.
Before BOOCHEVER, Chief Justice, RABINOWITZ, CONNOR and BURKE, Justices, and DIMOND, Justice Pro Tem.

OPINION
DIMOND, Justice Pro Tem.
In July 1973, Kobuk Engineering and Contracting Services, Inc. (Kobuk) purchased from Superior Tank and Construction Co-Alaska, Inc. (Superior) certain equipment located at Standard Oil's Beluga River gas field facility and at Mobil Oil's Granite Point tank farm. The equipment consisted of four trailers, two snowmobiles, three trucks, a motor grader, a tractor and a welder.[1]
The total purchase price was $55,300.00. Kobuk made a down payment of $6,000.00 and executed a promissory note for the balance of $49,300.00. Payments of principal and interest at eight per cent were to be made in the amount of $1,000.00 a month. The parties executed a security agreement and financing statement in conformity with art. 9 of the Uniform Commercial Code (UCC), which has been adopted in Alaska (AS 45.05.002-794).
Kobuk encountered financial difficulties and failed to make the $1,000.00 payments for the months of June and July 1974. In accordance with the provisions of the UCC § 9-504(3) [AS 45.05.788(c)], Superior mailed to Kobuk on August 26, 1974, a Notice of Public Sale of Collateral After Default. On that date, copies of the notice were delivered to the clerks of the district and superior courts in Anchorage for posting on their respective bulletin boards and to the General Services Administration for posting on the bulletin board in the United States Post Office in the federal building in Anchorage. The notice provided that the equipment that Kobuk had purchased from Superior would be sold at public sale to the highest bidder for cash on September 6, 1974 at 1:15 p.m., at the main door of the Boney Memorial Court Building in Anchorage.
*1010 At the scheduled time and place, Superior's counsel sold the equipment for $10,000.00 to Superior. Superior was the only bidder, and its counsel and owners were the only persons present. Immediately after the sale, Superior entered into negotiations with oil companies to lease or sell the property, resulting in a lease until October 19, 1974, when the property was sold for $25,000.00 cash.
Superior then commenced an action against Kobuk to recover a deficiency judgment in the amount of $35,059.46, which was equal to the unpaid balance of the note, less the $10,000.00 bid by Superior at the sale. The trial judge filed his memorandum decision on May 6, 1976, holding that Superior was entitled to a deficiency judgment. Judgment was entered accordingly on June 2, 1976, providing that Superior was entitled to recover from Kobuk the sum of $35,059.46. Kobuk then brought this appeal. Kobuk's principal contention is that the sale of the equipment was not held in a "commercially reasonable" manner as required by the UCC,[2] and therefore, the deficiency judgment against it should be set aside.
Section 9.504(3)[3] of the UCC requires a secured party who disposes of collateral after default to conduct the disposition in a manner which is commercially reasonable as to every aspect of the disposition, including the method, manner, time, place and terms. However, the price that is obtained at such a sale is not dispositive. The Code in § 9.507 provides that "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner."[4] A sale is commercially reasonable, within the meaning of the UCC, if
the secured party either sells the collateral in the usual manner in a recognized market for it, if he sells at the price current in that market at the time of his sale, or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold... .[5]
The $10,000.00 price Superior paid for the equipment appears to be considerably less than one might expect when one considers that the purchase price Kobuk agreed to pay was $55,300.00 and that the equipment had been used by Kobuk for only about 14 months prior to the foreclosure sale. But as the Code states, a seemingly low price does not in itself establish that the amount bid at the sale by Superior was not commercially reasonable. Other facts must be considered.
First of all, the notice of sale listed the property to be sold, but did not state where it could be located and seen by prospective buyers. Furthermore, the notice was published only by delivering copies to the clerks of the state courts and to the General Services Administration for posting.[6] It was not published in any newspapers of general circulation in the area where the equipment was situated or sold. Thus, considering the limited scope of the notice given, it appears likely that the number of those who would be interested in this type of equipment who would have seen the notice of the sale must have been relatively few, as compared to the number who would have seen the notice had it been more widely distributed by publication in one or more newspapers.
*1011 The limited scope of the notice of sale is of particular importance in cases such as this where the secured party purchases the collateral at the sale. AS 45.05.788(c), [UCC § 9-504(3)] provides that unless the collateral is "of a type which is the subject of widely distributed standard price quotations," the secured party may only buy at a "public sale." Although such notice as was given in this case went out to the general public, this sale in the courthouse, reminiscent of the sheriff's sales which prompted these provisions in the Uniform Commercial Code, did not comport with the spirit of the Code's default and disposition provisions.[7] Where by failing to give such notice as would guarantee competitive bidding the secured party insures an opportunity for self-dealing, we will scrutinize the sale closely.
Superior did not establish that it had solicited bids from those who would have been most likely to be interested in the property, such as dealers, contractors or oil companies. Although not required to do so, such action by Superior might well have established some of the criteria for a commercially reasonable sale, i.e., that the sale was "in the usual manner in a recognized market" for the equipment sold and was "at the price current in that market at the time of [the] sale."[8] In addition, although no appraisals of the equipment by dealers in that type of equipment or others familiar with the value of the equipment were required, had they been obtained, Superior might have established another criterion  that the sale was "in conformity with reasonable commercial practices among dealers in the type of property sold."[9]
These matters assume importance in determining the main question on this appeal because of what happened after sale of the equipment to Superior for $10,000.00, which was made on September 6, 1974. From that date until October 19, 1974, Superior leased the equipment to Mobil Oil Company at a rate somewhere between $100.00 and $500.00 a day. Then, on October 19, 1974, approximately six weeks after Superior had purchased the property at the foreclosure sale, it sold the equipment to Mobil for $25,000.00. This was $15,000.00 more than Superior had paid for the equipment at the sale on September 6th. What all this amounts to is that Superior had been paid approximately $16,000.00 in cash by Kobuk, $25,000.00 in cash from Mobil's purchase of the equipment, and some uncertain sum for rental, which may have been in the neighborhood of $10,000.00 or more,[10] for a total of approximately $51,000.00. In addition, Superior secured a deficiency judgment against Kobuk for over $35,000.00. It is of interest to note again that the total purchase price for the equipment when it was sold to Kobuk by Superior 14 months prior to the foreclosure sale was $55,300.00
The Uniform Commercial Code provisions dealing with secured transactions aim to protect both the creditor and the debtor. Each party has certain duties. The secured creditor  in this case, Superior  had the duty to conduct the sale of the collateral in a "commercially reasonable"[11] manner. Ordinarily, the creditor establishes that this duty has been fulfilled by showing that the collateral was sold for its fair market value.[12]
It might be argued that the price for which the collateral sells is evidence of its fair market value. But in this case, Superior *1012 was the only bidder at the sale and "sold" the property to itself for $10,000.00, which was credited against the balance due on the note that had been executed by Kobuk. The price at which a creditor "buys in" the collateral that secures a debt is not a reliable indicator of the fair market value of the collateral because the transaction is self-serving.[13] It is obvious that this is true here because six weeks after purchasing the property for a $10,000.00 credit against Kobuk's debt, Superior sold the property for $15,000.00 more than it had paid for it.
The ultimate question here is whether the sale of the equipment by Superior to itself for $10,000.00 was commercially reasonable. The burden of proving the commercial reasonableness of the sale was on Superior,[14] and not on Kobuk. This is particularly true where, as here, the creditor purchased the property for itself at a sale where, because of the limited notice given, there was the opportunity for self-dealing. There is authority holding that a secured party makes out a case for deficiency judgment by proving the debt and security agreement and that a credit of a stated amount has been allowed as a result of the sale of the collateral and that the burden of proof then shifts to the debtor to show why the creditor should not recover the deficiency. See Vic Hansen & Sons, Inc. v. Crowley, 203 N.W.2d 728, 732 (Wis. 1973). But we choose to follow those jurisdictions which hold that the secured party must establish that every aspect of the sale was commercially reasonable.[15] We believe that this rule more accurately recognizes the tenor and intent of the UCC. This seems to us to be the better rule because the secured party has a duty under the Code to proceed in good faith (UCC § 1.203, AS 45.05.024) and in a commercially reasonable manner. It would seem to follow that he who has a duty should also have the burden of proving fulfillment of that duty. Therefore, upon the trial of this case, it was essential for Superior to establish that every aspect of the sale was commercially reasonable, including the adequacy of the price for which Superior bought the property at the foreclosure sale. Vic Hansen & Sons, Inc., supra.
We believe that Superior did not meet the burden of establishing a commercially reasonable sale. In bidding on the property for itself, it did not establish either (1) that the collateral was sold "in the usual manner in a recognized market for it," or (2) that it sold "at the price current in that market at the time of ... sale." AS 45.05.794(b). Finally, it can hardly be said that Superior proved that it had "otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold." AS 45.05.794(b).
We have mentioned that under the UCC, the fact that a better price could have been obtained by a sale at a different time or by a different method from that selected by the secured party is not in itself sufficient to establish that the sale was not made in a commercially reasonable manner. UCC § 9.507(2). But a substantial discrepancy in price, when viewed in light of the aggregate of circumstances surrounding the sale, is certainly relevant to a determination of whether the sale was commercially reasonable.[16] And where there is such a discrepancy, we will closely scrutinize the sale.[17] Here, for the sum of $10,000.00, *1013 Superior bought the property that had been sold 14 months earlier for $55,300.00. The method of notice made it unlikely that other bidders would appear to bid at the time and place of sale. Superior did nothing to establish the fair market value of the collateral. Superior could have, for example, attempted to get in touch with potential bidders among users or dealers in heavy equipment, vehicles or trailers. It could have contacted other contractors or oil companies. Apparently, it did not take this action. Within six weeks after Superior had purchased the property for a $10,000.00 credit against Kobuk's debt, Superior sold the collateral for two and one-half times what it had paid for it at the foreclosure sale.
After considering all of the circumstances of the sale of the collateral by Superior to itself for $10,000.00, and the immediate leasing of the property to Mobil, followed closely by a resale for $25,000.00, we are convinced that the initial sale by Superior to itself was not commercially reasonable, and that the trial court was clearly mistaken in holding to the contrary. The sale conducted by Superior, as detailed in the notice of sale, was not in accord with reasonable commercial practices.
The next question deals with the effect of a sale of collateral which is not conducted in a commercially reasonable manner. Some authorities hold that the creditor is not entitled to any deficiency judgment against the debtor. For example, Anderson in his treatise on the Uniform Commercial Code states: "The creditor is not entitled to a deficiency judgment unless the sale of the collateral was conducted in a manner which was commercially reasonable."[18] Apparently, this is the view of the majority of the courts which have passed on the question.[19]
However, we consider this apparent majority view to be repugnant to the spirit of the UCC. We agree with the Supreme Court of New Mexico, which has stated:
The complete denial of the deficiency smacks of the punitive and is directly contrary to Article Nine's underlying theme of commercial reasonableness.
`If the secured party has reimbursed the debtor for any losses incurred by improper sale, he has approximated the commercially reasonable sale. Thus, he should be allowed to receive the money which would have been due if the sale had been commercially reasonable.'[20]
We hold that the commercially unreasonable sale made by Superior acts to decrease the amount of the deficiency judgment which Superior is entitled to recover from Kobuk. The fair and reasonable value of the collateral at the time of repossession should be offset against the balance due on the security agreement.[21] Where the collateral has been sold in a sale that does not comply with the provisions of the UCC, there is a rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt.[22] In order to overcome that presumption, the secured party has the burden of either (1) obtaining a fair and reasonable appraisal at or near the time of *1014 repossession, or (2) producing convincing evidence of the value of the collateral.[23] In order to meet the latter burden, the secured creditor is required to bring forward proof of the condition of the collateral and the usual price of items of like condition. The case must be remanded for a determination of these issues.
Kobuk's final point on appeal is that the trial court erred by making no finding that Superior had extended the time for payment under the promissory note and security agreement. There was a conflict of testimony on this point. As Kobuk admits in its reply brief:
There was a conflict in the testimony by Mr. Robinson (of Kobuk) that Mr. Jackson (of Superior) had extended the time for payments due on the note.
In its memorandum decision, the only relevant statement made by the trial court regarding the note was that "[t]here is no dispute that Kobuk was in default on the note." Since this was not a clear finding that time for payments on the note had or had not been extended, we remanded the case to the trial court for a specific finding on this question. The trial court responded by making the following finding:
I find ... [t]he appellee Superior Tank and Construction Co.  Alaska, Inc. did not grant Kobuk Engineering and Contracting Services, Inc. an extension of time for payments under the promissory note and security agreement.
We have reviewed the testimony on this matter and are not firmly convinced that the trial court was clearly mistaken in making such a finding. Therefore, we hold that the finding that payment on Kobuk's note had not been extended by Superior is not clearly erroneous.[24]
The judgment is reversed and the case remanded for further proceedings not inconsistent with the views expressed in this opinion.
REVERSED AND REMANDED.
NOTES
[1] The equipment located at the Beluga River gas field facility consisted of one 12 by 55 foot house trailer, one 8 by 30 foot camp trailer and two snowmobiles. The equipment located at the Granite Point tank farm consisted of one Dodge truck with a heavy duty winch, one GMC truck with a dump bed, one Ford 3/4-ton pickup truck, one Caterpillar motor grader, one Construction King tractor, backhoe and loader, one 10 by 55 foot trailer, one 10 by 50 foot trailer completely skirted with 16 by 52 foot building trailers attached, and one Lincoln welder with cutting torch.
[2] The trial judge held the sale to be commercially reasonable.
[3] The corresponding Alaska provision is AS 45.05.788(c).
[4] The corresponding Alaska provision is AS 45.05.794(b).
[5] AS 45.05.794(b). The Code provision is UCC § 9.507.
[6] The notices presumably were posted, although the only evidence in the record is the affidavit of a person who delivered the notices to the clerks of the state courts and to the General Services Administration for posting. There were no affidavits from either of the offices to which the notices were delivered indicating that the notices were in fact posted and remained posted for any period of time.
[7] See J. White & R. Summers, Uniform Commercial Code § 26-11, at 981, 992-94 (1972).
[8] AS 45.05.794(b). The Code provision is UCC § 9.507.
[9] Id. We recognize that the isolated location of the equipment may have made an appraisal unduly expensive.
[10] The rental was for a period of approximately 43 days. At the rate of from $100.00 to $500.00 a day, the total rental paid would be somewhere between $4,300.00 and $21,500.00.
[11] Vic Hansen & Sons, Inc. v. Crowley, 57 Wis.2d 106, 203 N.W.2d 728, 731 (1973); Foster v. Knutson, 85 Wash.2d 538, 527 P.2d 1108, 1115 (1974); Dynalectron Corp. v. Jack Richards Aircraft Co., 337 F. Supp. 659, 663 (W.D. Okl. 1972).
[12] Vic Hansen, supra, n. 11 at 731.
[13] Id at 733.
[14] Id. at 732-33; Dynalectron Corp. v. Jack Richards Aircraft Co., 337 F. Supp. 659, 662 (W.D.Okl. 1972); Franklin State Bank v. Parker, 136 N.J. Super. 476, 346 A.2d 632, 635 (1975); Clark Leasing Corp. v. White Sands Forest Products, Inc., 87 N.M. 451, 535 P.2d 1077, 1080 (1975).
[15] This holding was foreshadowed in Weaver v. O'Meara Motor Co., 452 P.2d 87 (Alaska 1969), in which we held that when the secured party had failed to comply with the notice provisions of AS 45.05.788(c), the burden of proving adequate price and commercial reasonableness was on the secured party. See also n. 14, supra.
[16] Mercantile Financial Corp. v. Miller, 292 F. Supp. 797, 801 (E.D.Pa. 1968).
[17] See in re Zsa Zsa Ltd., 352 F. Supp. 665, 671 (S.D.N.Y. 1972), aff'd. 475 F.2d 1393 (2d Cir.1973); Mercantile Financial Corp. v. Miller, 292 F. Supp. 797, 801 (E.D.Pa. 1968); Central Budget Corp. v. Garrett, 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (1975). Cf. Sierra Financial Corp. v. Brooks-Farrer Co., 15 Cal. App.3d 698, 93 Cal. Rptr. 422 (1971).
[18] 4 Anderson, Uniform Commercial Code § 9.504:28 at 623 (1971).
[19] See Clark Leasing Corp. v. White Sands Forest Products, Inc., 87 N.M. 451, 535 P.2d 1077, 1081 (1975).
[20] Id. at 1081-82, quoting Minetz, "May a `Wrongdoer' Recover a Deficiency Judgment, or is Section 9-507(1) a Debtor's Exclusive Remedy?", 6 UCC L.J. 344, 363 (1974). See also A to Z Rental, Inc. v. Wilson, 413 F.2d 899, 909 (10th Cir.1969); Cornett v. White Motor Corp., 190 Neb. 496, 209 N.W.2d 341, 344 (1973).
[21] See, e.g., Roanoke Industrial Loan and Thrift Corp. v. Bishop, 482 F.2d 381, 385 (4th Cir.1973); Harris v. Bower, 266 Md. 579, 295 A.2d 870, 876 (1972). See generally, Cornett v. White Motor Corp., 190 Neb. 496, 209 N.W.2d 341, 344 (1973).
[22] See, e.g., Universal C.I.T. Credit Co. v. Rone, 248 Ark. 665, 453 S.W.2d 37, 39-40 (1970); Conti Causeway Ford v. Jarossy, 114 N.J. Super. 382, 276 A.2d 402, 404-05 (1971).
[23] This court, operating under a similar rule in Weaver v. O'Meara Motor Co., 452 P.2d 87, 91-92 (Alaska 1969), held that an appraisal of the collateral combined with a good faith effort to sell the collateral at the best possible price was sufficient to overcome that presumption.

In this case, it should be noted, as bearing on the value of the collateral, that Superior not only purchased the collateral for a $10,000.00 offset on Kobuk's debt, but in addition, sold the collateral to Mobil for $25,000.00 and, prior to the sale, leased it to Mobil between September 6 and October 19, 1974 at a rate of between $100 and $500 a day.
[24] Alaska Foods, Inc. v. American Mfr.'s Mut. Ins. Co., 482 P.2d 842, 848 (Alaska 1971).