QUEEN OF THE NORTH, INC., an Alaskan Corporation, James Williams and Guy Bassett, Appellants,

v.

Henry J. LeGRUE and Etta C. LeGrue, Appellees.

No. 3512.

Supreme Court of Alaska.

July 21, 1978.

Dan K. Coffey, Kay, Christie, Fuld & Saville, Anchorage, for appellants.

Warren C. Colver, Anchorage, for appellees.

## OPINION

Before BOOCHEVER, C. J., and CONNOR, BURKE, and MATTHEWS, JJ.

BOOCHEVER, Chief Justice.

This case raises the issue of the propriety of a foreclosure sale in which a liquor license was ordered foreclosed by the trial court but was never sold. We reverse the decision of the trial court confirming the sale and establishing a deficiency judgment and remand to give the LeGrues the option of selling the license or waiving the deficiency judgment.

In 1974, James Williams and Guy Bassett, incorporated as Queen of the North, Inc.,[1] purchased the Beachcombers, a Kodiak restaurant, bar and hotel established in a renovated ferry boat placed on dry land. The agreed purchase price for the business was $350,000.00. The corporation paid $40,000.00 down, assumed an $185,000.00 Small Business Administration note secured by a first deed of trust and issued a promissory note for $125,000.00 secured by a second deed of trust to the owners, Henry and Etta LeGrue.

The buyers made repairs ordered by the State Fire Marshal and began to operate the Beachcombers. There was a dispute about the payment of the bill for the repairs necessitated by the Fire Marshal's order, and Queen of the North, claiming that the LeGrues had refused to honor their written promise to reimburse the corporation for certain repairs, failed to make payments on the second deed of trust.

The LeGrues filed a claim for foreclosure on the second deed of trust on March 7, 1975, alleging that the corporation had defaulted and was committing waste of the assets. Queen of the North continued to operate the Beachcombers until January of 1976,[2] at which time the establishment was left vacant.[3]

Superior Court Judge Carlson, on October 22, 1976, in a memorandum decision, found that the LeGrues were entitled to foreclose against "the premises, liquor licenses and personalty secured by the second deed of trust." The court also awarded punitive damages of $15,000.00 against Williams and $5,000.00 against Bassett for "permitting . . . great waste."

A few days later, the LeGrues filed a motion for summary judgment against the Alcoholic Beverage Control Board. The LeGrues claimed: (1) that AS 04.10.330, which precludes the transfer of any license until all creditors are paid or satisfied, was inapplicable to foreclosure cases; (2) that they, as secured creditors, had precedence over general creditors; and (3) that the court had the authority to direct the Alcoholic Beverage Control Board to transfer the license. The Board responded that the question of whether the LeGrues had a security interest in the liquor license presented a genuine issue of fact. In opposition to the motion for summary judgment, the Board argued that the second deed of

---

1. Unless the context otherwise requires, we shall refer to appellants collectively as "Queen of the North."

2. Queen of the North alleged in support of a motion to amend counterclaims that the maintenance of the structure was so costly that it was unable to operate the Beachcombers at a profit.

3. On April 1, 1976, Queen of the North instituted voluntary bankruptcy proceedings. Claiming authority as a debtor in possession, Queen of the North then removed materials and fixtures from the Beachcombers, reassembled them in a nearby building and petitioned the Alcoholic Beverage Control Board for a transfer of license location. The bankruptcy court ordered the corporation to cease removing fixtures from the Beachcombers and to refrain from petitioning to transfer the license.

On July 26, 1976, the bankruptcy court dismissed the bankruptcy petition, permitting further foreclosure proceedings.

trust, upon which the LeGrues foreclosed, did not grant them an interest in the liquor license.

Judge Carlson, on November 3, 1976, granted the LeGrues' motion for summary judgment and directed the Board to "immediately issue the license to plaintiffs at a suitable location."[4] He noted that the matter was of "some urgency" since the Beachcomber's liquor license had not been exercised, as required by statute, for thirty days during the calendar year. Under AS 04.10.-350(b), a license lapses if it is not exercised for that minimum time each year.

While finding that the LeGrues could not consider the liquor license as part of the collateral covered by the formal security agreement, Judge Carlson found "a security interest . . . in the nature of an equitable lien" in the license. He found an intent between the LeGrues and the corporation that "the entire Beachcomber business, including the liquor license, serve as security for payment of the debt."

In support of his finding that the LeGrues held a security interest in the form of an equitable lien in the license, Judge Carlson pointed to an escrow arrangement in which the LeGrues had deposited with the bank holding the second deed in trust several documents to be delivered to the LeGrues in the event of default.[5] One of the documents was an Alcoholic Beverage Control Board form on which Queen of the North consented to a transfer of liquor license to the LeGrues. The application is dated April 12, 1974, indicating that the parties signed the purported transfer at the time Queen of the North was buying the Beachcombers from the LeGrues.[6]

The court, on November 26, 1976, issued a judgment and decree of foreclosure ordering that:

. . . the real and personal property described in the attached Exhibit "A" and "B" . . . *the liquor license*, or so much thereof as may be sufficient to satisfy the amount found to be due plaintiffs, and which may be sold separately without material injury to the parties in interest, be foreclosed and sold at public auction according to law. (emphasis added)

The decree further directed:

That plaintiffs' deed of trust, [s]ecurity agreement and liquor license are hereby foreclosed and that the property be sold to satisfy said obligations.

The decree also stated that the proceeds of the sale would be applied first to sale expenses and secondly to the LeGrues in satisfaction of their lien, costs, and attorney's fees; and that "the plaintiffs or any of the parties to this suit may purchase at such sale."

The notice of public sale advertised only "the following described personal property, to wit 'the Beachcombers' along with all equipment and lots of land belonging to Queen of the North, Inc." There was no public notice that the liquor license was to be sold.

The LeGrues were the only bidder for the property and paid $100,000.00, assuming the first deed of trust held by the Small Business Administration for $178,000.00.

The LeGrues then moved, under AS 09.-35.180,[7] for an order confirming the sale and establishing a deficiency against Queen

---

4. The Beachcombers, due to water damage, a broken boiler, burst pipes and vandalism, was unusable as a business.

5. The agreement directs the bank to deliver the documents "upon demand of said vendors" if an installment were thirty days overdue.

6. The LeGrues, in pleadings of October 18, 1976, alleged that the liquor license was transferred from them to Queen of the North in August of 1974. The Alcoholic Beverage Con-

trol Board, in its opposition to the LeGrues' motion for summary judgment, noted that it had approved a license transfer from the LeGrues to Queen of the North. No date was given.

7. AS 09.35.180 applies to confirmation of sale of personal property sold attendant to real property where a creditor appropriately elects this method. *See* discussion, *infra*.

of the North for $41,937.69. Judge Carlson granted the motion on May 13, 1977.

Queen of the North filed a timely appeal from the order of confirmation.[8]

AS 09.35.180(a) provides that a judgment creditor may, upon motion, apply for an order confirming the sale, and:

> [t]he judgment debtor may object to the confirmation of the sale on the grounds that there were substantial irregularities in the proceedings of sale which caused probable loss or injury to the judgment debtor.

If the court finds substantial irregularity and probable injury, "it shall deny the motion and direct that the property be resold in whole or in part as upon an execution."[9] The statute specifies no standard for appellate review of a trial court confirmation of sale.

The substantive provisions of this statute have been interpreted only once in the past fifty years.[10] In *Lunsford v. Kaiser Gypsum Co., Inc.*, 516 P.2d 151, 152 (Alaska 1973), we held that:

> [t]he effect of a valid confirmation order is to insulate the sale procedure from subsequent challenge based upon a mere irregularity in the conduct of the sale.[11]

█ We find that the failure to list the liquor license in the public notice of sale[12] and the failure to sell the license as directed by the decree of foreclosure constitute a substantial irregularity in the sale for purposes of AS 09.35.180.[13] Had the license been sold as ordered, the purchase price might have been greater than the $100,000.00 and perhaps sufficient to cover the deficiency awarded against Queen of the North.[14] This suffices for the "probable

8. On June 10, 1977, they also filed a notice of appeal from the May 13, 1977 order imposing a deficiency judgment. The appeal is thus timely under the thirty-day rule of Appellate Rule 7(a)(1). They claim, however, to be appealing from the November 26, 1976 decree of foreclosure as well. Such a claim is improper, as no appeal was filed within thirty days of that decree. Thus, the only appeal properly before us is that from the order confirming sale and establishing a deficiency judgment.

9. AS 09.35.180(b). The statute also provides, in AS 09.35.180(d):

> An order confirming a sale is a conclusive determination of the regularity of the proceedings concerning the sale, as to all persons, in any other action or proceeding.

10. In *Mallonee v. Grow*, 502 P.2d 432 (Alaska 1972), we were concerned with the procedural requirement of notice.

11. The earlier cases are in accord with this general statement. *Lesamis v. Greenberg*, 225 F. 449, 453 (9th Cir. 1915); *Heid v. Ebner*, 133 F. 156, 158 (9th Cir. 1904); *Pecaravich v. Gilmore*, 6 Alaska 108 (1918); *Noland v. Coon*, 1 Alaska 36, 40 (1890).

12. At the time of the sale, AS 09.35.140 provided:

> *Notice of sale on execution.* Before the sale of property on execution, notice of the sale shall be given as follows.
>
> (1) Notice of the sale of personal property is given by posting a written or printed notice of the time and place of sale in three public places within five miles of the place where the sale is to be held, not less than 10 days

prior to the day of sale. One of the notices shall be posted at the post office nearest to the place where the sale is to take place.

> (2) Notice of the sale of real property is given by posting a similar notice particularly describing the property not less than four weeks prior to the day of sale in three public places, as provided in (1) of this section, and publishing a copy of the notice four times, once a week for four successive weeks in a newspaper of general circulation published nearest to the place of sale.

13. Appellant also claims that no notice of the time and place of sale was ever sent them. Such personal notice, however, is not required by Civil Rule 5(a) nor by the applicable statutes.

14. The bankruptcy court in June of 1976 made a finding of fact that the real property at the Beachcombers was then valued at $97,000.00, improvements at $12,000.00, the personal property at $61,000.00 and the liquor license at $75,000.00. Thus, the total estimated value of the property was found to be $245,000.00, including the license.

The LeGrues on repurchase paid $100,000.00 and assumed the first deed of trust payable to the SBA for approximately $178,000.00 plus interest from May 31, 1975. Only the $100,000.00 was applied against the adjudged deficiency of $141,937.69 leaving a final deficiency of $41,937.69. While the LeGrues' bid exceeded the value found by the bankruptcy court, there is no means by which we could ascertain what price would have been received had the license been included with the items sold.

loss or injury to the judgment debtor"[15] requisite to the declaration of substantial irregularity under the statute.[16]

The LeGrues elected to proceed as to both the real and personal property under the provisions for foreclosure of real property—securing a court order of sale. AS 45.05.782(d) provides:

> If the security agreement covers both real and personal property, the secured party may proceed under §§ 782–794 of this chapter as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of §§ 782–794 of this chapter do not apply.[17]

Nevertheless, it must be determined whether there was a secured interest established in the liquor license, so that it was legally subject to disposition with the real property.

Under Alaska's codification of the U.C.C., a security interest attaches only where: (1) there exists a written security agreement; (2) value is given by the creditor; and (3) the debtor has rights in the collateral.[18] Additionally, AS 45.05.020(37) defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation."

█ The test under which a document is determined to be a security agreement is one of intent to create a security interest in the collateral. AS 45.05.698(a)(8) defines "security agreement" as "an agreement which creates or provides for a security interest." *See* Coogan, "A Suggested Analytical Approach to Article 9 of the Uniform Commercial Code," 63 Col.L.Rev. 1, 6–7 (1963).

The Official Comment to the U.C.C., § 9–102 (AS 45.05.692), states:

> [T]he principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?
>
> . . . . .
>
> When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it.[19]

A liquor license qualifies as a "general intangible," defined in AS 45.05.700 as:

> personal property (including a thing in action) other than goods, accounts, contract rights, chattel paper, documents, and instruments.[20]

---

**15.** AS 09.35.180(a).

**16.** While the foreclosure was by court order, this finding of irregularity is analogous to the requirement of Article 9 of the Uniform Commercial Code, codified in Alaska as AS 45.05.690–.794, that the secured party who sells without a court order dispose of collateral in a commercially reasonable manner. AS 45.05.788 provides in part that:

(a) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following a commercially reasonable preparation

. . . .

(c) Disposition of the collateral may be by public or private proceedings. . . . Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

. . .

*See Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.,* 568 P.2d 1007 (Alaska 1977). We held that the burden of proving the commercial reasonableness of the sale was on the secured party, especially where the creditor purchased the property. Furthermore, where collateral is sold in a sale which does not comply with the U.C.C. provision, there exists a "rebuttable presumption that the fair and reasonable value of the collateral is at least equal to the amount of the outstanding debt." *Id.* at 1013.

**17.** Secs. 782–794 of Alaska's Title 45, Chapter 5, correspond to Art. 9, § 5 of the U.C.C. and control remedies in default.

**18.** AS 45.05.720; AS 45.05.722(a).

**19.** Nordstrom and Clovis, Selected Commercial Statutes, 501 (1972).

**20.** Kripke, "Suggestions for Clarifying Article 9: Intangibles, Proceeds and Priorities," 41 N.Y.U.L.Rev. 687, 690–91 (1966).

In *Gibson v. Alaska Alcoholic Beverage Control Board*, 377 F.Supp. 151, 153 (D.Alaska 1974), the court held that a liquor license could qualify as a security interest under Alaska's codification of Article 9.

■ We find that the parties intended the liquor license to be subject to a security interest by virtue of the written agreement, which directed the bank to retain the executed transfer application until buyer default, at which time it was to deliver the application to the LeGrues.[21]

Because the Alcoholic Beverage Control Board is authorized to control the sale of intoxicating liquor by issuing only those licenses which it considers "in the best interests of the public,"[22] any transferee, even one who takes for valuable consideration, actually takes only the right to petition the ABC Board for transfer of the license.[23] It was this right to petition which the parties intended to serve as a security interest.

In the present case, we direct that the LeGrues be given the option of reselling the license or of waiving the deficiency awarded to them.[24] There is no need to resell the remaining real and personal property, as the appeal is not taken from the actual decree of foreclosure,[25] and there was no irregularity in the sale of those items. The decree of foreclosure permitted separate sale of the liquor license.

We also consider the propriety of the trial court's finding that the LeGrues had "a security interest in the liquor license in the nature of an equitable lien which was enforceable against the defendants [Queen of the North] and subject to foreclosure." This was the basis for ordering the transfer of the license. Although he noted that the matter was "of some urgency" because the license was by AS 04.10.350(b) required to be exercised for thirty days per year, he did not specifically limit the duration of the equitable remedy to that period.[26]

The trial court relied on a Michigan case finding that the doctrine of equitable lien applied where a party bought goods and in writing directed a bank to disburse certain proceeds (to be deposited) in favor of the seller.

[A]n equitable lien arises from an agreement that both identifies property and

---

**21.** The trial court found that the parties had intended the license to serve as collateral but also found that this did not suffice to create a "security agreement."

**22.** AS 04.05.030(b).

**23.** In addition, no license may be transferred except with the written consent of the Board. AS 04.10.330(a). The application for transfer must be accompanied by a statement under oath listing all creditors, and the Board shall not approve the transfer unless all debts and taxes are paid, or the transferor gives security satisfactory to the creditor. AS 04.10.330(b). *See C. Y., Inc. v. Brown*, 574 P.2d 1274 (Alaska 1978). The Board may not issue a license to a person who has resided in the state for less than one year. AS 04.10.150. Regulations list, *inter alia*, the following as possible grounds for revocation or suspension of a license to any person: a violation of any ABC regulation, a plea or judgment of guilty to "any public offense involving moral turpitude," failure to comply with public health regulations, and conviction on a charge of gambling. 15 AAC 20.-010. The Board is also prohibited by statute from issuing licenses except as meet population

limitations, AS 04.10.210, and zoning limitations, AS 04.10.230.

**24.** The Queen of the North agreed in its brief that it did not appeal any decision of the superior court except the entry of the deficiency judgment.

**25.** *See* Note 8.

**26.** Weighing in support of the equitable remedy were: (1) the fact that the LeGrues had deposited in an escrow account an application of transfer of the liquor license from *buyer to seller*, under instruction to turn it over to seller upon demand should buyer default; (2) the intent of the parties to make the liquor license security for payment of the debt; and (3) the corporation's waste of the secured assets. In subsequent findings of fact, Judge Carlson found that Williams and Bassett "wilfully and maliciously closed and abandoned the Beachcomber leaving the premises in total disrepair and ruin," and also wrongfully removed personal property, fixtures and liquor inventory.

evidences an intention that such property serve as security for an obligation. *Warren Tool Co. v. Stephenson*, 11 Mich. App. 274, 161 N.W.2d 133, 139 (1968). The court specifically found that the doctrine of equitable lien had survived the enactment of Article 9 of the U.C.C.[27]

 Judge Carlson was justified in invoking the doctrine of equitable lien to prevent the loss of the license. This purpose was applicable in this case only until the license was operated for the statutory minimum number of days in order to prevent its lapse. We find that under its general equity powers, the court had the authority to declare an equitable lien and to order the transfer of the license only insofar as it was necessary to preserve the asset and that the equitable lien should not have survived beyond the statutory minimum number of days necessary to preserve it.

The order of the trial court upholding the regularity of the sale is reversed, and the case is remanded for the purpose of ordering a sale of the liquor license or, in the alternative, securing a waiver of deficiency judgment by the LeGrues.

REVERSED AND REMANDED.

---

27. *Id.* at 148–49. Equitable remedies have been invoked in non-U.C.C. contexts where appropriate. *See Imler Earthmovers, Inc. v. Schatten*, 240 So.2d 76, 78 (Fla.App.1970); *Hill v. Hill*, 185 Kan. 389, 345 P.2d 1015, 1023–24 (1959); *Dasher v. Bruno*, 5 Ill.App.2d 500, 126 N.E.2d 404, 407 (1955).