[No. 3910–1. Division One. October 10, 1977.]

MOUNT VERNON DODGE, INC., *Appellant,* v. SEATTLE–FIRST NATIONAL BANK, *Respondent.*

*Allen Lane Carr, Inc., P.S.,* and *Allen L. Carr,* for appellant.

*Davis, Wright, Todd, Riese & Jones* and *Allen D. Clark,* for respondent.

CALLOW, J.—The plaintiff, Mount Vernon Dodge, Inc., an insolvent automobile dealership, brought suit for the alleged conversion of assets taken by the defendant, Seattle–First National Bank, claiming under the terms of the security agreements and article 9 of the Uniform Commercial Code (RCW 62A.9). The trial court dismissed the plaintiff's complaint with prejudice and awarded judgment to the defendant in the sum of $7,596.34, together with interest, costs and attorney's fees. The plaintiff challenges (a) the denial of a jury trial, (b) the constitutionality of the self–help provisions of the Uniform Commercial Code, (c) the repossession of the security as not being accomplished in a commercially reasonable manner, and (d) the repossession of property claimed to be leased equipment not included in the security of the lender.

The plaintiff filed its summons and complaint on March 31, 1972, and received an answer shortly thereafter. The note for trial docket was filed May 24, 1972. No jury

demand was filed by the plaintiff. The trial date was set originally for September 24, 1973, but was continued by agreement until February 19, 1974. The order of continuance executed by both parties and filed September 11, 1973, showed the case as a "nonjury case."

On January 21, 1974, the defendant filed a motion for summary judgment, which was granted in part, the trial court finding the following facts as established for the purpose of further proceedings:

1. The security agreements and notes executed by Mount Vernon Dodge to Seattle–First National Bank are valid and enforceable obligations against Mount Vernon Dodge.

2. As of at least November 5, 1971, Mount Vernon Dodge was in default under the terms of such security agreements and notes.

On February 19, 1974, the date the case was to be tried as a nonjury case, a dispute had arisen between Kenneth Cook, a stockholder of Mount Vernon Dodge, and the plaintiff's attorney as to the conduct of the case, and Mr. Cook filed with the court a letter which the court considered to be a demand for jury trial. However, no jury fee was deposited. The court denied the demand for jury trial, permitted counsel to withdraw, continued the trial to May 1, 1974, and ordered the plaintiff to pay $500 in costs to the defendant at least 3 weeks before the trial date as a condition of pursuing the case.

Approximately 3 weeks before the scheduled trial date of May 1, 1974, the plaintiff's attorney reentered the case upon the assurance that Mr. Cook would disassociate himself from the case and allow the matter to be conducted by the attorney in accordance with his judgment. On approximately April 30, 1974, at the request of the defendant's counsel, the matter was stricken from the trial docket because witnesses for the defendant were not available. On May 9, 1974, a new note for the trial docket was filed, and on May 16, 1974, a demand for jury was filed on behalf of the plaintiff. The defendant's motion to strike the jury

demand was granted and the matter was ultimately brought on for trial on April 15, 1975.

The trial court's findings show that Mount Vernon Dodge, Inc., was a Washington corporation engaged in selling and servicing automobiles, trucks and campers. From early 1969 until approximately August 6, 1971, the Seattle–First National Bank had been lending funds to Mount Vernon Dodge to finance its sales and service operations. As security for such loans, Mount Vernon Dodge granted to Seattle–First National Bank security interests in all of its assets, consisting of (1) all new and used automobiles; (2) all new and used trucks; (3) all new and used campers and camper units; (4) all equipment, including shop equipment and tools; (5) all inventory, including parts and accessories, gas, oil and miscellaneous supplies; and (6) all accounts receivable. The trial court found that the notes and security agreements evidencing the security interests were valid and enforceable obligations of Mount Vernon Dodge to the Seattle–First National Bank.

Earl Corwin was from July 1971 until November 4, 1971, the president of Mount Vernon Dodge. Bryan Bickmore was the designated dealer on the dealer franchise agreement between Mount Vernon Dodge and the Chrysler Motors Corporation, Dodge Division. In July 1971, Seattle–First National Bank notified Mount Vernon Dodge that it would no longer finance its operations without the addition of equity capital from new investors. From that time to November 1971, Corwin and Bickmore sought additional capital for the corporation and alternative sources of financing for Mount Vernon Dodge's operations. They found none.

During the period from July 1971 to November 1971, Mount Vernon Dodge purchased no new automobiles or trucks, and substantially few used automobiles or trucks, for purposes of resale. The corporation was in weak financial condition, with insufficient capital, insufficient cash flow, and an inability to obtain financing from any source. During this period, Mount Vernon Dodge was selling the

inventory which existed as of July 1971, and the business was, in effect, winding up.

During October 1971, Mount Vernon Dodge breached its contractual commitments and trust arrangements with Seattle–First National Bank by selling automobiles and trucks in violation of the provisions of the notes and security agreements which were then in effect between the parties. Seattle–First National Bank made demand upon Mount Vernon Dodge for the indebtedness then due and owing under the notes and security agreements, and accelerated the indebtedness.

The trial court's findings further state in part:

8. During the period from July 1971 to November 1971, Mr. Corwin and Mr. Bickmore negotiated with numerous individuals, including Mr. Lloyd Vogel [and] Mr. Kenneth Cook on behalf of Lairmont, Inc., a Washington corporation owned by Mr. Vogel and Mr. Cook, for the sale of the shares of Mount Vernon Dodge.

. . .

14. As of at least November 1, 1971, Mount Vernon Dodge was insolvent; was in default under the terms of its Notes and Security Agreements with Seattle–First National Bank; had failed to pay its rent and, as a result, its lease for the facility was cancelled as of November 1, 1971; had overdrawn its checking accounts; had no means with which to pay the indebtedness to Seattle–First National Bank; and was unable to continue in business.

15. During the period from July 1971 through November 3rd, 1971, Mr. Vogel and Mr. Cook on behalf of Lairmont, Inc., made inventories and examined the books, records and assets of Mount Vernon Dodge and conferred on numerous occasions with Mr. Earl Corwin relative to the purchase of Mr. Corwin's shares of Mount Vernon Dodge. . . .

. . .

17. On or about November 3 and November 4, 1971, Lairmont, Inc., purchased the two–thirds interest of Mr. Earl Corwin in Mount Vernon Dodge. Lairmont, Inc., is a Washington corporation whose shares are owned by Mr. Vogel and Mr. Cook. . . . In purchasing the two–thirds interest of Mr. Earl Corwin in Mount Vernon Dodge, Mr. Vogel [and] Mr. Cook on behalf of Lairmont, Inc., were

purchasing an empty corporate shell and they knew it. . . . Mr. Cook, as lessor of the facility to Mount Vernon Dodge, was involved in the purchase to gain access to the equipment and fixtures which would be left on the premises by Mount Vernon Dodge subsequent to the cancellation of the lease. Mr. Cook, as lessor, cancelled the lease of Mount Vernon Dodge, lessee, as of November 1, 1971.

18. As of at least November 1, 1971, all of the officers, directors and agents of Mount Vernon Dodge and Mr. Vogel, Mr. Cook and Lairmont, Inc., were aware that Seattle–First National Bank had made demand upon Mount Vernon Dodge for payment of all sums then due and owing and had notified Mount Vernon Dodge that it would, if payment were not forthcoming, have no alternative but to take possession of its collateral in accordance with the Security Agreements. All of such individuals and corporations were aware that Mount Vernon Dodge had no ability to pay the indebtedness to Seattle–First National Bank.

19. Mount Vernon Dodge, its officers and directors, and Mr. Vogel, Mr. Cook and Lairmont, Inc., had totally failed to demonstrate to Seattle–First National Bank sufficient reliability, either financially or otherwise, to enable Seattle–First National Bank to allow the collateral to remain on the premises. Seattle–First National Bank was entitled to, under the terms of its Security Agreements, and acted reasonably in taking possession of all of the collateral which it held as security for its indebtedness and storing such collateral in a secure location.

20. On November 5, 6 and 7, 1971, Seattle–First National Bank took possession of all the collateral in which it held a security interest, including:

(a) 1971 automobiles and trucks;

(b) 1971 campers and camper units;

(c) Used automobiles, campers and trucks;

(d) Parts, equipment and accessories, including shop equipment and tools;

(e) Inventory, including parts, accessories, gas, oil and miscellaneous supplies;

(f) Accounts receivable.

All actions taken by Seattle–First National Bank on these dates in taking possession of the collateral were

reasonable and proper and consented to by Mr. Bryan Bickmore on behalf of Mount Vernon Dodge. Mr. Bryan Bickmore, on behalf of Mount Vernon Dodge, assisted Seattle–First National Bank in taking possession of the collateral. There were no improper actions taken by Seattle–First National Bank at any time on these dates.

21. The automobiles, trucks, campers and camper units were inventoried by Seattle–First National Bank on November 5, 6, and 7, 1971, and driven to a location known as Truckers International located in Mount Vernon, Washington. They were placed in a fenced, locked storage location. The parts, equipment, accessories, inventory, gas, oil and miscellaneous supplies were placed in rental trucks, padlocked and driven to the Truckers International location, where they were maintained, padlocked, in the interior of the Truckers International building. Seattle–First National Bank employed security guards to protect the autos, trucks, campers, camper units, parts, equipment and accessories at the Truckers International location.

22. On November 5, 6 and 7, 1971, the accounts receivable ledgers of Mount Vernon Dodge were provided to Seattle–First National Bank and were taken to the Mount Vernon Branch of Seattle–First National Bank located in Mount Vernon, Washington.

23. During the week of November 8, 1971, Seattle–First National Bank officers were informed by employees of Truckers International that instances of theft had been experienced within the prior few weeks from the fenced and locked yard. Thus, during the week of November 8, 1971, the automobiles, trucks, campers, camper units, parts, equipment, accessories and miscellaneous supplies were moved by Seattle–First National Bank to an enclosed warehouse located at 1000 West Hazel Street, Mount Vernon, Washington. This location was approximately ten blocks from downtown Mount Vernon, Washington. The automobiles, trucks, campers, camper units, parts, equipment, accessories and miscellaneous supplies were placed inside the locked warehouse.

24. At no time did any thefts or damage occur to any of the collateral which Seattle–First National Bank took into its possession.

25. On November 10, 1971, Mr. Bryan Bickmore, as designated dealer and on behalf of Mount Vernon Dodge,

notified Chrysler Motors Corporation, Dodge Division, that he was terminating the Dealer Franchise . . . The franchise could be terminated by its terms on or before November 1, 1971, due to the insolvency of Mount Vernon Dodge.

26. On November 11, 1971, Seattle–First National Bank mailed, certified mail, return receipt requested, to Mount Vernon Dodge, the three guarantors of the indebtedness of Mount Vernon Dodge . . . and to holders of subordinate security interests, a notice, in compliance with the provisions of RCW 62A.9–504(3) . . . Such notice informed the respective addressees, including Mount Vernon Dodge, that Seattle–First National Bank would sell, at private or public sale, all inventory, including but not limited to, auto parts and new and used automobiles and trucks of Mount Vernon Dodge on or after November 22, 1971.

27. Seattle–First National Bank hired the parts manager and service manager of Mount Vernon Dodge to inventory and sort all parts and accessories. All parts and accessories which were acceptable for return by Chrysler Motors Corporation were sold to Chrysler Motors Corporation under the terms of the Dealer Franchise Agreement buy–back provisions. All remanufactured parts were sold back to Tam Engineering Company. All remaining parts and accessories consisted of miscellaneous obsolete and junk parts.

28. On or about November 16, 1971, Seattle–First National Bank mailed an advertisement for the public sale of new and used cars, trucks, campers, canopies and inventory of Mount Vernon Dodge . . . This advertisement was mailed to Mount Vernon Dodge, the three guarantors, and approximately 20 to 25 automobile truck and camper dealers. These dealers comprised all dealers in Skagit and Snohomish Counties and included dealers in King County, Washington. At his request, such advertisement was also mailed to Mr. Lloyd Vogel. The advertisement indicated that the method of sale would be public sale on a written bid basis. In its advertisement, Seattle–First National Bank reserved the right to determine the acceptability of the bids. The purpose of such reservation was to insure that the collateral would be sold at the best available price.

29. Any and all officers, directors and authorized agents of Mount Vernon Dodge and Mr. Vogel, Mr. Cook and Lairmont, Inc., were fully aware of and had actual knowledge of the dates, times, place and terms of sale of the inventory of Mount Vernon Dodge. Mr. Bryan Bickmore and Mr. Lloyd Vogel were in attendance at the sale. Mr. Bryan Bickmore assisted Seattle–First National Bank with the sale.

30. On November 18, 19 and 22, 1971, in accordance with the advertisement, the automobiles, trucks, campers and camper units were placed up for public sale on a bid basis by Seattle–First National Bank. Seattle–First National Bank received and reviewed bids from 23 automobile, truck and camper dealers and other individuals who attended the sale.

31. Mr. Lloyd Vogel attended the sale and submitted bids on every item at the sale, including parts and accessories, on behalf of himself and of Lairmont, Inc. Mr. Lloyd Vogel actually purchased nine vehicles at the sale. At no time, either before or during the sale, did Mr. Vogel, Mr. Bickmore or any other shareholder, officer, agent or director of Mount Vernon Dodge make any objections to the method, manner, time, place or terms of sale or of the prices received as a result of the sale.

32. After receipt of the bids on the automobiles, trucks, campers and camper units, Seattle–First National Bank reviewed each and every bid to determine the reasonableness thereof. In addition, Seattle–First National Bank reviewed each high bid on each vehicle with [the three guarantors] prior to the sale of the vehicle.

33. With regard to six automobiles, Seattle–First National Bank determined that the bids received were not reasonable and, therefore, rejected such bids. Seattle–First National Bank further determined that, should minor body work be done on such vehicles, they would produce higher prices. Seattle–First National Bank authorized such work to be done and such automobiles were subsequently sold at public sale on a bid basis for prices higher than the original bids received. Mr. Lloyd Vogel purchased one of these automobiles on his own behalf.

34. The miscellaneous, obsolete and junk parts were sold by public sale, on a bid basis. Seattle–First National

Bank received approximately eight bids, including one bid from Mr. Kenneth Cook.

35. The accounts receivable ledgers were reviewed by Seattle–First National Bank. Seattle–First National Bank, immediately after November 5, 1971, mailed notices to each account debtor informing them that any and all further payments should be made directly to Seattle–First National Bank and requested the acknowledgement of the account debtor. Approximately one month later, Seattle–First National Bank mailed an additional notice demanding payment to all account debtors who had either not remitted payment or had not responded to the initial letter. Approximately one month subsequent to the second letter, a third letter was mailed to the account debtors, demanding payment and notifying them that, in the event of failure to pay, their account would be turned over to a collection agency. With the exception of substantially disputed accounts, or accounts claiming legitimate setoffs, the unpaid accounts receivable were turned over to Skagit Bonded Collections, a collection agency located in Mount Vernon, Washington, for purposes of collection.

36. Each and every aspect of taking, holding and preparing the collateral for disposition and the disposition of the collateral by public sale on a bid basis, including the time, place, advertisement, method, manner, terms and prices obtained and the disposition and collection of the accounts receivable were performed in accordance with the standard custom and practice of Seattle–First National Bank.

37. Each and every aspect of taking, holding and preparing the collateral for disposition and the disposition of the collateral by public sale on a bid basis, including the time, place, advertisement, method, manner, terms and prices obtained and the disposition and collection of the accounts receivable were performed in accordance with the standard custom and practice of the banking and financial industry.

38. Each and every aspect of taking possession, holding and preparing collateral for disposition and the disposition of the collateral by public sale on a bid basis, including the time, place, advertisement, method, manner, terms and prices obtained and the disposition and

collection of the accounts receivable were performed in a commercially reasonable manner.

39. The indebtedness of Mount Vernon Dodge to Seattle–First National Bank as of November 5, 1971, [totalled] $129,055.95.

40. Seattle–First National Bank incurred . . . expenses in taking, holding and preparing collateral for sale, in the sale of the collateral and in the collection of accounts receivable [in the total sum of] $5,825.34. All such expenses were reasonable and necessary.

41. As a result of the sale of autos, trucks, campers and camper units, Seattle–First National Bank realized [a total of] $91,378.23.

42. As a result of the sale of all parts and accessories and miscellaneous supplies and collection of amounts due on the parts account from Chrysler Motors Corporation, Seattle–First National Bank received [a total of] $17,726.69.

43. As a result of collections of accounts receivable, Seattle–First National Bank realized the sum of $6,033.75 . . .

44. There existed, on November 5, 1971, a contingency reserve on installments sales contracts in the sum of $12,146.28 held by Seattle–First National Bank for the account of Mount Vernon Dodge.

45. There remains, after application of proceeds of sale and collection and application of the contingency reserve, a deficiency due and owing to Seattle–First National Bank by Mount Vernon Dodge in the sum of $7,596.34. Such sum is computed as follows . . .:

| | | |
|---|---|---|
| Indebtedness | | $129,055.95 |
| Proceeds of Sale: | | |
| Vehicles | $91,378.23 | |
| Parts | 17,726.69 | |
| Accounts Receivable | 6,033.75 | |
| Total: | $115,138.67 | |
| Less Expenses | –5,825.34 | 109,313.33 |
| | | $19,742.62 |
| Less Contingency Reserve | | –12,146.28 |
| DEFICIENCY: | | $7,596.34 |

*When the right to trial by jury has not been demanded timely under CR 38, may the right be revived?*

The plaintiff concedes that the denial in March 1974 of the initial demand for a jury trial was proper, but argues that the denial in September 1974 of a subsequent demand was improper. The plaintiff bases its contention on the proposition that when the case was stricken from the trial calendar the case reverted to the status of a pending case, thus renewing the plaintiff's right to demand a jury trial prior to the case being reset for trial. We disagree.

The trial court, in denying the second jury demand, was aware that the demand had been denied previously and considered the motion to strike the second jury demand, the affidavit of the attorney for the plaintiff, and the argument of counsel. The order denying the second jury demand stated:

> ORDERED that the Court cannot look behind Judge Soderland's order, and, therefore, the motion for order striking jury demand made by defendant, Seattle–First National Bank, is granted, and that the jury demand filed by Mount Vernon Dodge, Inc., in this cause, on May 16, 1974, is hereby stricken;

It is uncontroverted that the right to trial by jury may be waived.[1] The duration of such a waiver is at issue. In *Park v. Mighell*, 7 Wash. 304, 305, 35 P. 63 (1893), a waiver of the right to trial by jury was held to bind the parties upon

---

[1] CR 38(b) and (d) read:

"(b) **Demand for Jury.** At or prior to the time the case is called to be set for trial, any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing, by filing the demand with the clerk, and by paying the jury fee required by law. If before the case is called to be set for trial no party serves or files a demand that the case be tried by a jury of twelve, it shall be tried by a jury of six members with the concurrence of five being required to reach a verdict."

"(d) **Waiver of Jury.** The failure of a party to serve a demand as required by this rule, to file it as required by this rule, and to pay the jury fee required by law in accordance with this rule, constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties."

remand of the cause for retrial following a reversal on appeal. *See also Shores Co. v. Iowa Chem. Co.,* 222 Iowa 347, 268 N.W. 581, 584, 106 A.L.R. 198 (1936); *MacKnight & Hoffman, Inc. v. Programs for Achievement in Reading, Inc.,* 96 R.I. 345, 191 A.2d 354, 355–56 (1963); *Lloyd v. Fidelity Nat'l Bank,* 180 Wash. 255, 39 P.2d 392 (1934). The rule in California was before the court in *Taylor v. Union Pac. R.R. Corp.,* 16 Cal. 3d 893, 898, 549 P.2d 855, 859, 130 Cal. Rptr. 23, 27 (1976), which, discussing the potential revival of a right to trial by jury after a waiver, stated "that once a party has waived right to jury trial that waiver cannot thereafter be withdrawn except in the discretion of the trial court."

█ We agree and recognize that, absent an abuse of discretion, the decision by the trial court to grant or deny a jury demand after a previous waiver will not be overturned. *Balise v. Underwood,* 71 Wn.2d 331, 340, 428 P.2d 573 (1967); *Davis v. Falconer,* 159 Wash. 230, 233–34, 292 P. 424 (1930); *Stempel v. Oregon Life Ins. Co.,* 157 Wash. 678, 679, 290 P. 222 (1930). *See further* 47 Am. Jur. 2d *Jury* § 65 (1969); Annot., 64 A.L.R.2d 506, 525 (1959).

█ Here, the plaintiff at first did not demand a jury until after the case had been set for trial and did not pay the required jury deposit. The right to a jury, therefore, was deemed waived. CR 38(b), (d). This waiver is unchallenged. We hold that it was not error to deny the plaintiff a jury under the circumstances. The machinations of the trial calendar or a situation whereby a case set for trial is stricken and later renoted does not revive the right once waived.

*Are the self–help provisions of RCW 62A.9–501 to 62A.9–507 unconstitutional?*

Mount Vernon Dodge asserts that RCW 62A.9–503, which authorizes self–help repossession of collateral without notice or a judicial hearing, unconstitutionally deprives persons of property without due process of law under both

the fourteenth amendment to the United States Constitution and article 1, section 3 of the Washington State Constitution. We do not concur.

 Article 1, section 3 of the Washington State Constitution states that "[n]o person shall be deprived of life, liberty, or property, without due process of law." RCW 62A.9–503 reads in pertinent part:

> Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action.

*Faircloth v. Old Nat'l Bank,* 86 Wn.2d 1, 5, 541 P.2d 362 (1975), *appeal dismissed,* 425 U.S. 986, 48 L. Ed. 2d 812, 96 S. Ct. 2195 (1976), recently stated that "[t]he great majority of federal and state courts which have considered the self–help provisions have found them constitutional." *See also Gibbs v. Titelman,* 502 F.2d 1107 (3d Cir.), 29 A.L.R. Fed. 406, *cert. denied,* 419 U.S. 1039 (1974); *Nowlin v. Professional Auto Sales, Inc.,* 496 F.2d 16 (8th Cir.), *cert. denied,* 419 U.S. 1006, 42 L. Ed. 2d 283, 95 S. Ct. 328 (1974); *James v. Pinnix,* 495 F.2d 206 (5th Cir. 1974); *Shirley v. State Nat'l Bank,* 493 F.2d 739 (2d Cir.), *cert. denied,* 419 U.S. 1009, 42 L. Ed. 2d 284, 95 S. Ct. 329 (1974); *Adams v. Southern California First Nat'l Bank,* 492 F.2d 324 (9th Cir. 1973), *cert. denied,* 419 U.S. 1006, 42 L. Ed. 2d 282, 95 S. Ct. 325 (1974); *Kipp v. Cozens,* 40 Cal. App. 3d 709, 115 Cal. Rptr. 423 (1974). The court reasoned that the self–help provisions of the code are necessary to protect the interests of creditors and that, but for these provisions of the code, there would be increased costs to defaulting debtors, increased interest rates, additional burdens on court systems, and less readily available credit. The court concluded that these provisions of the code did not violate due process since the State had not involved itself in the private remedy permitted the creditor by the debtor. *See also Borg–Warner Acceptance Corp. v. Scott,* 86 Wn.2d 276, 278, 543 P.2d 638 (1975). No argument has

been advanced that has not been answered in these opinions. The security agreements entered into between the parties were found to be valid and enforceable. There is no involvement by state officials in the privately contracted for self–help provisions under the code. The agreements allowed the creditor upon default to take possession of the collateral without notice, demand or judicial proceedings. This is not forbidden by the due process provisions of the United States or Washington Constitutions.

*Was the sale conducted "in a commercially reasonable manner" under RCW 62A.9?*

The debtor contends that the creditor's disposal of collateral was not done in a "commercially reasonable" manner. This argument is based on the claim that the creditor (1) breached the peace by taking possession of the debtor's inventory, (2) did not advertise the sale in newspapers, (3) mailed announcements of the sale only to selected dealers, (4) insufficiently described the collateral to be sold, (5) did not explore the local market before resale of vehicles to the manufacturer, (6) held a private sale, (7) seized and disposed of leased items not covered in the security agreements, and (8) failed to offer expert testimony at trial as to the proper method of disposing of seized assets. The debtor states that the creditor acted thusly, and therefore did not conduct a commercially reasonable sale. The findings of the trial court refute these claims.

It is the purpose of the self–help provisions of the Uniform Commercial Code[2] "to chart a path in the narrow area between two policy positions—one, a desire to impede

---

[2]The pertinent section of RCW 62A.9 reads in part:

"62A.9–504 Secured party's right to dispose of collateral after default; effect of disposition. (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

". . .

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect

dishonest dispositions, and the other, a reluctance to strangle honest transactions with red tape." Hogan, *The Secured Party and Default Proceedings Under the UCC,* 47 Minn. L. Rev. 205, 220 (1962). *Bryant v. American Nat'l Bank & Trust Co.,* 407 F. Supp. 360, 364 (N.D. Ill. 1976). *Clark Leasing Corp. v. White Sands Forest Prods., Inc.,* 87 N.M. 451, 453, 535 P.2d 1077, 1079–80 (1975), stated:

Sections 9–504(1) & (3) provide a creditor broad choices for disposing of repossessed collateral. But § 9–504(3) also imposes two requirements upon a reselling creditor. First, he must send the debtor reasonable notification of impending sale, . . . Second, every aspect of the sale, including the "method, manner, time, place and terms", must be "commercially reasonable." These requirements place upon the creditor the good faith duty

of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

"62A.9–507 Secured party's liability for failure to comply with this part. (1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions. . . .

"(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."

to the debtor to use reasonable means to see that a reasonable price is received for the collateral.

(Footnote omitted.)

The trial court found that the debtor had been given "reasonable notification" of the dates, times, place and terms of the sale of the inventory. The first requirement was met. *Mallicoat v. Volunteer Fin. & Loan Corp.*, 57 Tenn. App. 106, 415 S.W.2d 347 (1966).

■ The term "commercially reasonable" is not defined in the Uniform Commercial Code, which left this task to the court. 1 Coogan, Hogan & Vagts, *Secured Transactions Under the Uniform Commercial Code* § 8.04[2][a] (1976). *See C.I.T. Corp. v. Lee Pontiac, Inc.*, 513 F.2d 207, 209–10 (9th Cir. 1975). The requirements for a "commercially reasonable" sale are discussed in *Foster v. Knutson*, 84 Wn.2d 538, 549, 527 P.2d 1108 (1974). Those comments need no reiteration or elaboration. In *Vic Hansen & Sons, Inc. v. Crowley*, 57 Wis. 2d 106, 111–12, 203 N.W.2d 728, 731, 59 A.L.R.3d 360 (1973), we find:

The purpose of the Uniform Commercial Code is the protection of both the creditor and the debtor. Each party to the transaction has certain duties. The duty of the secured party in this instance was to obtain the best possible price it could obtain for the collateral for the benefit of the debtor. The secured party does not have to use "extraordinary means" to accomplish this result. Ordinarily, proof that the price obtained was the fair market value thereof would be sufficient.

(Footnote omitted.) As observed in *In re Zsa Zsa, Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972), *aff'd*, 475 F.2d 1393 (2d Cir. 1973):

[T]he primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale. If the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially accepted standards, he should be shielded from the sanctions contained in Article 9.

Further, while the element of price is a relevant factor to consider in determining whether the disposition was "commercially reasonable," price is not the sole determinative factor. *First Nat'l Bank v. Rose,* 188 Neb. 362, 196 N.W.2d 507 (1972); *Jones v. Bank of Nevada,* 91 Nev. 368, 535 P.2d 1279, 1281 (1975). As stated in *Pruske v. National Bank of Commerce,* 533 S.W.2d 931, 937 (Tex. Civ. App. 1976):

> The fact that a better price could have been obtained by selling at a different time and a different method from that selected by the secured party, is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner.

*Accord, James Talcott, Inc. v. Reynolds,* 165 Mont. 404, 529 P.2d 352, 355 (1974). The decision in *First Nat'l Bank & Trust Co. v. Holston,* 559 P.2d 440, 444 (Okla. 1976), comments on this aspect of a commercially reasonable sale as follows:

> The secured party is required to utilize his best efforts to sell the collateral for the best price and to have a reasonable regard for the debtor's interest. The commercial realities are that the secured creditor will generally try to obtain the highest possible price for collateral since recovery of any deficiency is usually dubious.

Answering the additional contentions of the debtor, we note that a private rather than a public sale was permissible. RCW 62A.9–504(3). The collateral disposed of consisted of new and used cars, trucks and campers. These items are customarily sold in a recognized market and are the subject of widely distributed standard price quotations. RCW 62A.9–504(3). The trier of fact may consider this factor in determining the commercial reasonableness of a private disposition. *Foster v. Knutson, supra,* is cited as requiring a public sale of the collateral. While *Foster v. Knutson,* which involved a secured party participating in a public sale of stock, does discuss the standards of conducting a public sale, it does not forbid private sales under the code. The decision in *Foster v. Knutson* does not forbid a private sale under the circumstances before us where the

creditor did not participate as a purchaser and the collateral had a "recognized market."

We disagree with the assertion that the disposition was not commercially reasonable due to the failure to display and sell the vehicles as a retail dealer. Section 9–507, Official Comment 2 of the Uniform Commercial Code states:

> One recognized method of disposing of repossessed collateral is for the secured party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales. Such a method of sale, fairly conducted, is recognized as commercially reasonable under the second sentence of subsection (2).

Official Comment 2, RCWA 62A.9–507. The creditor was not licensed to engage in the retail sale of automobiles as required by state law, nor did it have the ability to offer warranties to consumers, to accept or handle trade–ins, or to provide any type of continuing service in the way of repairs or replacements. The creditor was not engaged in retail automobile sales, and is not required to be so engaged to dispose of such collateral under RCW 62A.9–504 and –507. In essence, the debtor would require the creditor to provide all of the accouterments of the retail automobile dealer and sell the vehicles over an extended period of time. A commercially reasonable sale endeavors to consider the total situation, including the costs of disposing of the collateral, and does not ignore the overhead of the undertaking. It would not be reasonable to achieve the highest price possible if to do so the debtor expended sums greater than the difference achieved.

When the propriety of the disposition of collateral by the secured party is contested, the issue of commercial reasonableness is a question of fact to be determined by the trier of fact. *See Jones v. Morgan,* 58 Mich. App. 455, 228 N.W.2d 419, 422 (1975); *Pruske v. National Bank of Commerce, supra.* The trial court found that the burden of proof had been met by the creditor, and the findings of the

trial court are supported by substantial evidence. We will not overturn them on appeal.

*Was leased equipment that was not collateral under the security agreements wrongfully seized by the creditor?*

The trial court found that the creditor took possession of all of the collateral in which it had a security interest and that it did not act improperly in seizing shop equipment and tools. The testimony of a bank officer was that certain equipment was seized mistakenly, but that it was returned subsequently. Ultimately, it was established that this equipment was actually owned by the debtor. When all the evidence is considered, we find no error in the findings and conclusions of the trial court.

The judgment is affirmed.

FARRIS, C.J., and WILLIAMS, J., concur.