APPLETON STATE BANK, Plaintiff-Respondent, v. VAN DYKE FORD, INC., Defendant: NEWMAN and another, Defendants-Appellants.

Supreme Court

*No. 76–322. Submitted on briefs May 2, 1979.—*
*Decided June 12, 1979.*
(Also reported in 279 N.W.2d 443.)

For the appellants the cause was submitted on the briefs of *Patrick C. Hitt* and *Condon & Hanaway, Ltd.,* of Green Bay.

For the respondent the cause was submitted on the brief of *Robert M. Sigman* and *Sigman, Shiff, Janssen & Zoesch* of Appleton.

DAY, J. This is an appeal from a judgment entered October 11, 1976 by the circuit court for Outagamie County, the Honorable R. Thomas Cane, presiding, in which it was determined that the respondent Appleton State Bank (now Valley Bank) was entitled to recover a deficiency judgment of $165,545.90 against Defendant, Van Dyke Ford and Appellants, Charles J. Newman and Roland D. Van Dyke.

The question on appeal is:

WAS THE DISPOSITION OF COLLATERAL BY THE BANK AFTER DEFAULT BY THE DEBTORS COMMERCIALLY REASONABLE UNDER SEC. 409.-504(3), STATS. (1973)?

The Appleton State Bank made several commercial loans to Van Dyke Ford, Inc., a Ford dealership located in Kaukauna, Wisconsin, beginning May 1, 1972. Roland D. Van Dyke, president of Van Dyke Ford, and Charles J. Newman, vice president of Van Dyke Ford, gave their personal guarantees on the loans. In addition, the Bank took security interests in the inventory accounts receivable, and equipment of Van Dyke Ford.

Van Dyke Ford defaulted on its loans and violated the terms of its security agreements. The Bank began a foreclosure action against Van Dyke Ford on July 19, 1974. Before a hearing could be held on the matter, Van Dyke Ford entered into a voluntary surrender of collateral agreement, in which it acknowledged that it was in default. The agreement also provided:

"Appleton State Bank is free to dispose of said collateral and realize upon it in any manner authorized by the security agreements or the Wisconsin Uniform Commercial Code and, by no means by way of limitation, but by express agreement (it being at the request of Debtor, and deemed to be in the best interest of Debtor) Appleton State Bank is authorized to utilize the personnel and facilities of Country Side Lincoln-Mercury Sales & Service of Oshkosh, Wisconsin as its agent for the disposition

of the used cars which comprise a portion of the collateral herein transferred to Bank. It is understood that said agent is to be given forty-five days (with the option on the part of Appleton State Bank to extend said period) to sell said used cars in the ordinary course of business for such prices as it may obtain, remitting to books of Debtor, with any excess being realized by Country Side Lincoln-Mercury to be its commission on such sales to cover its overhead and a reasonable profit."

Countryside Lincoln-Mercury was an automobile dealership in Oshkosh. There was testimony that Mr. Newman had an interest in Countryside, which was operated by Mark Gill, an officer and director of Van Dyke Ford.

The voluntary surrender agreement was executed on July 23, 1974. At the request of the debtor, the Bank delayed taking physical possession of the premises until the close of business July 24, 1974, to allow the debtor time to inform its employees of the closing of the business. As of July 23, 1974, the debtors owed the bank $392,673.80.

On default, the Bank took over collateral of five types: 1) Previously untitled Ford automobiles, including new cars, cars from the previous model year, demonstrator cars, and driver education cars; 2) used cars; 3) Ford automobile parts and accessories; 4) equipment, including garage and office equipment, new and used tires and tools; and 5) accounts receivable. Facts relevant to the commercial reasonableness of the Bank's disposition of the collateral will be referred to in the balance of this opinion.

The trial court determined that the Bank disposed of the collateral in a commercially reasonable manner, and that it was entitled to a judgment against the debtors for a deficiency of $165,545.90. This figure included $17,-240.48 for attorney fees.

The Uniform Commercial Code, as adopted by Wisconsin, requires that disposition of collateral by a secured party after default must be commercially reasonable. [1]

[1] Sec. 409.504(3), Stats., (1973):

"409.504. **Secured party's right to dispose of collateral after default; effect of disposition.** . . . (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale."

Sec. 409.507(2), Stats., (1973):

"409.507. **Secured party's liability for failure to comply with default provisions.** . . . (2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the 2 preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially

In addition, sec. 401.203, Stats., provides that: "Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement."

Courts have differed on whether the issue of commercial reasonableness is a question of law or fact. In *Mount Vernon Dodge, Inc. v. Seattle-First National Bank,* 18 Wash. App. 569, 570 P.2d 702, 712 (1977), it was stated that when the propriety of the disposition of collateral by the secured party is contested, the issue of commercial reasonableness is a question of fact to be determined by the trier of fact. Such findings will not be overturned unless against the great weight and clear preponderance of the evidence. See also, *Jones v. Morgan,* 58 Mich. App. 455, 228 N.W.2d 419, 422 (1975). On the other hand, *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F. Supp. 659 (W.D. Okla. 1972), took the view that the ultimate question of commercial reasonableness is one of law, but that time and method may involve questions of fact.

In *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis.2d 106, 111–12, 203 N.W.2d 728 (1973), this court said that the secured party owed a duty to the debtor to use all fair and reasonable means in obtaining the best price for the property on sale. The secured party need not use "extraordinary means" to accomplish this result. Ordinarily, proof that the price obtained was the fair market value would be sufficient.

In most cases what constitutes a "commercially reasonable" disposition of collateral will be a fact question dependent on the surrounding facts and circumstances. However, where a record would not support a finding of disposition of collateral in the "usual manner in any

reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."

recognized market" or at the "price current in such market," or in accordance with "reasonable commercial practices," a court could rule as a matter of law that a particular sale was not done in a commercially reasonable manner. *Vic Hansen & Sons, Inc.*, 57 Wis. at 115.

With respect to the untitled or new Ford automobiles the record shows that prior to default, Van Dyke Ford was selling new cars "out of trust." "Out of trust" means that although cars were designated as collateral, the auto dealership was selling the cars, but not turning the proceeds over to the Bank to pay off the indebtedness on the loan. Prior to the Bank's taking possession, Van Dyke Ford was out of trust by $50,158.

In this group of collateral, there were twenty-one cars listed as new which had only normal delivery scratches. There were also twenty-six driver education and demonstration cars which had more damage. Some of the cars required complete repainting. Others had tires and stereos missing, and had damaged interiors. There were some cars from the previous model year, and there were cars with up to 14,000 miles on them. In addition, the value of the cars was affected by the fact that the sale took place late in the model year when the model changeover was imminent.

The Bank anticipated that another Ford dealer would come to the area to take over the operation, but this did not happen. Ford Motor Company was not interested in repurchasing any of the new vehicles. The Bank decided to sell the cars as a package because it was late in the model year, and 1974 had been a poor year. As a result, many dealers were experiencing inventory problems. In addition, it was felt that if the cars were sold piecemeal, the buyers would pick out the better cars and leave the Bank holding the less saleable ones.

The sale was denominated as a "semi-private" sale in the notice to the debtors. The Bank sent notice of the

sale to at least twenty-three Ford dealers throughout the state. On the day of the sale, four dealers appeared and submitted competitive bids. The bids ranged from a low of $131,000 to $157,000. The cars were sold to the highest bidder, Les Stumpf Ford.

There was testimony that the Bank notified only Ford dealers of the sale because of problems in registering the cars if sold to other than a Ford dealer. Furthermore, there was testimony that the cars would have been worthless to a non-Ford dealer because he could not warrant the cars.

Sec. 409.504(3) authorizes the disposition of collateral in either public or private proceedings, so long as a standard of commercial reasonableness is followed. It has been held that the secured party must choose between a public or private sale depending on which is more commercially reasonable. *Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F. Supp. 698, 712 (E.D. Pa. 1968).

Official UCC Comment 2 to 409.507 notes that:

"One recognized method of disposing of repossessed collateral is for the secured party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales. Such a method of sale, fairly conducted, is recognized as commercially reasonable under the second sentence of subsection (2)."

Further, White and Summers, *Uniform Commercial Code*, Hornbook Series (1972) comments:

"It is axiomatic that retail sales will bring a higher price than sales in the wholesale market, but retail marketing and advertising expenses will also exceed those of the wholesale market. For instance, a bank who attempts large scale resales of repossessed automobiles on the retail market may incur substantial additional expenses

which it may seek to add to the deficiency under 9–504 (1) (a)." *Id.* at 990–91.

The primary focus of commercial reasonableness is not the proceeds received from the sale but rather the procedures employed for the sale. *In re Zsa Zsa Ltd.*, 352 F. Supp. 665, 671 (S.D.N.Y. 1972). If the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially accepted standards, he should be shielded from the sanctions contained in Article 9. *Id.*

The record amply supports the conclusion of the trial court that the Bank acted in good faith to maximize the proceeds of the sale of the untitled automobiles.

By the terms of the voluntary surrender agreement, the parties agreed that the Bank was authorized to use Countryside Lincoln-Mercury of Oshkosh, Wisconsin as its agent to dispose of the used car inventory. This arrangement was suggested by Van Dyke's officers. The record showed that Mr. Newman had an interest in Countryside, which was operated by Mark Gill, an officer and director of Van Dyke Ford.

When Bank personnel arrived at the premises of Van Dyke Ford to take possession, they discovered that the debtors had physically removed the used car inventory at the direction of Mr. Van Dyke, earlier that day. This was done without the Bank's knowledge or approval. The record shows that twenty-one of the fifty-five used cars to which the Bank held title were not accounted for by Countryside or Van Dyke Ford.

Alfred J. Mahlick, assistant vice president of Appleton State Bank, testified that as Countryside sold off the used cars, they would call the Bank for approval.

The Bank consulted the "blue book" as a rough guide to value. Some were sold below blue book value, some were sold above blue book value. He testified that the price varied with the condition of the cars, and that most of the used cars sold were in poor condition. However, no testimony was given as to the actual price at which the cars were sold.

In *Vic Hansen, supra,* the debtors returned a used automobile they had purchased when it developed mechanical problems immediately following the sale. The dealer sold the car back to itself through an inter-office exchange of papers, and credited the debtors with $700 for the sale. The car had been originally appraised as having a "wholesale" value of $800, and was sold to debtors for $1,595. There was no evidence as to the retail value of the car at the time the dealer resold the car to itself.

The court held that the dealer had not sufficiently established that the $700 was a commercially reasonable price, noting:

"There is no evidence as to what the fair market value of the vehicle was upon deficiency sale; nor did plaintiff establish that $700 was in fact the wholesale price, or what effect the repairs of the vehicle had upon the value of the automobile itself. There is some evidence of abuse to the vehicle but no evidence as to its effect upon the value. All that was submitted were self-serving assertions that the vehicle was worth $800 to $700 wholesale, and $1,595 to $995 retail."

The instant case is quite different factually. The debtors agreed to have the used cars sold by Countryside which was operated by one of Van Dyke Ford's officers, and Mr. Newman, one of the guarantors on the bank loans, had an interest in Countryside. This arrangement was in fact suggested by the debtors.

Sec. 409.501(3), Stats., (1973) provides:

"409.51. **Default; procedure when security agreement covers both real and personal property** . . . . (3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (ss. 409.504(3) and 409.505(1) and with respect to redemption of collateral (s. 409.506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable: . . . (b) Sections 409.504(3) and 409.505(1) which deal with disposition of collateral; . . ."

Where the debtors not only proposed the disposition of collateral in question, but took an active part in the sale of the assets through a related corporation, they are estopped from questioning the commercial reasonableness of the sale. See, *Ralston-Purina Co. v. Bertie*, 541 F.2d 1363, 1366 (9th Cir. 1976).

The Bank determined that the parts inventory could not be returned to Ford Motor Company, since Ford claimed a greater offset against Van Dyke Ford than the value of the parts. The Bank was also advised by Thorp Sales Company that it was not feasible to sell the parts at an auction.

As a result the Bank decided to offer the parts for sale to auto part companies and Ford dealers in Minnesota and Wisconsin. The Bank sent written notice to thirteen Ford dealers in the Minnesota-St. Paul area and twenty-five Ford dealers in Wisconsin, as well as some parts dealers, advising them that a sale of the parts would be held at 10:30 a.m. on December 2, 1974 at the dealership. However, nobody showed up at the sale.

The Bank contacted various dealers by telephone to see if they would be interested in coming in to give a bid or

at least look at the parts. However, the Bank was told that they were not interested and that they would charge to do an inventory of the parts. There was testimony that a large number of the parts were obsolete or slow-moving, and that most dealers normally carry a full inventory of parts and cannot afford to acquire surplus parts.

Finally, the Bank had a call from Les Stumpf who sent an employee to inventory the parts. Stumpf submitted a bid of $11,193.13 on November 25, 1974 which was accepted by the Bank. The bid rate was 26.21 cents on the dollar of inventory cost. Werner Koehler, business manager of Van Dyke Ford at the time of default, testified that Van Dyke Ford did not heavily stock current parts, but bought in minimum quantities. In his judgment, one could reasonably expect to recover only fifteen to twenty percent on the dollar on the sale of such a collection of parts.

Manford Thompson, parts manager for Les Stumpf Ford, testified that less than twenty percent of Van Dyke's inventory represented current parts. He stated that twenty-five cents on the dollar would be the normal amount to be paid by a dealer purchasing a complete inventory of parts.

The office and garage equipment was auctioned off by the Thorp Sales Corporation on September 4, 1974. Thorp had experience in liquidating businesses that had closed down.

Thorp publicized the sale through an extensive direct mail list. They also furnished auction bills to each of their offices to be distributed to local automobile dealers. The Bank mailed similar bills to all of their branches and their holding company. Thorp also did extensive newspaper and radio advertising of the auction in the local area. There were at least 300 registered bidders at the auction which yielded $48,662.50.

A frame machine that was attached to the floor of the building was not sold at the auction. The machine was appraised as having a replacement price of $6,604.00 by Automotive Supply Company on September 9, 1974. There was testimony that fair value for used machinery is based on sixty percent of the replacement cost, or $3,960.00 in this case. The machine was sold to the highest bidder for $3,058.00. There was testimony that it was impossible to sell the complete machine because part of it was permanently attached to the building. That portion was valued at $1,500.00 leaving a fair value on the portion that was sold at $2,460.00.

The record showed that of the $79,520.36 accounts receivable shown on Van Dyke Ford's books, $39,500.00 or about half was owing from related corporations; Countryside Lincoln-Mercury, United Leasing Company, and United National Recreations. These companies were related by same ownership, directors, and officers to Van Dyke Ford, Inc. Although the Bank made demand for payment, they refused to pay. One of the related companies, United National Leasing, had also defaulted on its loans, and the Bank was in the process of liquidating that business.

Werner Koehler, Van Dyke's Ford's business manager for the six months preceding default, testified that at times of cash flow problems, there were transfers of funds between Van Dyke Ford and these related corporations. It was not uncommon for a transfer of $20,000 or $30,000 to occur. Although he was responsible for supervising collecting accounts receivable, Koehler said he never handled collection of sums from the related corporations. These transfers were done at the direction of Mr. Van Dyke.

In the closing days of business, some of the funds received by Van Dyke Ford were deposited to the account of United National Recreation. Mr. Koehler testified

that transfers were to secure quick operating cash for a short period of time.

Mr. Koehler testified that twenty-five to thirty percent of the total accounts receivable on the books of Van Dyke Ford were more than 120 days old, and that during the entire six months that he had worked there, no accounts had been written off.

The Bank had seven full-time employees engaged in collecting delinquent accounts. A Bank vice president testified that they were used to the fullest extent in collecting Van Dyke Ford's accounts receivable, and that the Bank did not charge the debtor for their time.

There were disputed setoffs of $13,072.67 which the Bank was unable to collect. There were customers who had moved, representing $2,449.38 in accounts receivable. The Bank did collect $13,049.46 from the remaining accounts.

Based on this factual record, the trial court was amply justified in finding that the Bank had disposed of the collateral in all categories in a commercially reasonable manner. Such finding was not against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.