[No. 43068.     En Banc.     November 7, 1974.]

MYRON S. FOSTER, JR., et al., *Appellants*, v. RONALD L. KNUTSON et al., *Respondents*.

*Dow & Foster, Earl W. Foster, J. Harold Anderson,* and *Terrence M. McCauley,* for appellants.

*Melvin F. Buol* (of *Keller, Rohrback, Waldo, Moren & Hiscock*) and *Frederick M. Crollard, Jr.,* for respondents.

UTTER, J.—The Superior Court, in a nonjury trial, awarded judgment in favor of Myron and Earl Foster and Janet Conrad, appellants, for $15,703.35 against Ronald and Jack Knutson and their wives, respondents and cross-appellants.

Appellants claim they are entitled to a deficiency judgment for approximately $115,000 and to foreclose on mortgages given as security after respondents defaulted on a contract to purchase corporate stock. Respondents/cross-

appellants claim damages for wrongful rescission of the contract and further ask for refund of all sums paid under the contract of purchase.

We reverse the trial court and hold for appellants and direct that a deficiency judgment be entered and foreclosure against the supplemental mortgages be allowed to proceed.

The primary question we consider is whether or not parties to a contract who deal at arm's length may, themselves, determine what acts are sufficiently serious to constitute a breach of obligation entitling the nonbreaching party to the remedies bargained for without alteration of the terms of the agreement by a court.

On September 7, 1968, respondents Knutson and one Herbert Thomas entered into a contract to purchase from appellants Foster all of the outstanding stock of Hesperian Orchards, Inc., a Washington corporation engaged in fruit growing and warehousing in the Wenatchee Valley. The purchase price was $453,500 with a downpayment of $131,585. As security for payment of the purchase price, the total number of shares being purchased were deposited in escrow with the Seattle-First National Bank. The downpayment of $131,585, required by the sellers, was borrowed by respondents from Oneonta Trading Corporation, and respondents gave their promissory note in that amount to the lender.

Oneonta retained the first $131,585 of net proceeds plus interest from the crop produced by Hesperian Orchards as payment of its note by respondents. To avoid the appearance that corporate income had been used to satisfy the individual obligations of respondent purchasers, the amount paid to Oneonta Trading Corporation was entered on the corporate books as salaries and loan to Thomas and respondents Knutson.

In the winter of 1968-69, a disastrous freeze struck the Wenatchee Valley area destroying as much as two-thirds of the older apple trees in the valley. Hesperian Orchards, Inc.,

was without the financial reserves to meet a disaster of this severity. As a direct result of this freeze, the 1969 apple crop of Hesperian Orchards was severely reduced in value, and the orchard suffered extreme financial loss.

A dispute had also arisen between the parties concerning whether the annual payments called for in the contract between them included or were exclusive of interest to the date of payment. In addition to this dispute, the sellers were of the view that the contract purchasers had failed to maintain proper corporate books and records. The sellers also objected to the salaries and loans made by the corporation to the purchasers, which moneys allowed the purchasers to "bootstrap" their acquisition of the corporation. For all these reasons, sellers declared a default in the contract, obtained the pledged stock from the bank and gave notice of their intention to sell the stock.

No sale of stock, however, was consummated at that time. Instead, a new agreement was entered into on April 13, 1970, between the parties to this lawsuit, Thomas not being a party to this later agreement. In the new agreement, the effects of the 1968-69 freeze were taken into account and principal payments owing under the original agreement were deferred. Purchasers conceded in the April 13 agreement that they had "failed to keep proper books and records, [and] agree[d] that the future maintenance of such books and records is paramount and that this requirement runs to the inducement for this agreement and modification."

The modification agreement of April 13 further provided that (1) "As part of the inducement given by Purchasers to Sellers for modification of this contract, the Purchasers have executed and delivered to the Sellers certain mortgages of assets, which mortgages shall be supplemental security"; (2) In the event of default sellers may "elect to declare all payments due and delinquent and bring suit to recover the same as so accelerated or may pursue any remedies provided under the Uniform Commercial Code of

the State of Washington"; (3) "The Purchasers agree to provide the Sellers with balance sheets and operating statements showing the condition of the corporation at two-month intervals beginning June 1, 1970 . . ."; (4) "Purchasers shall cause the corporation to carry [adequate fire and liability] insurance . . ."; and (5) "The corporation shall at all times keep all taxes and assessments paid upon the properties."

On December 1, 1970, appellants gave notice to respondents that respondents were in default of the April 13 agreement, and that unless the defaults were cured within 30 days appellants would elect to declare the full purchase price due and seek all remedies available to them according to law and the terms of the contract as modified between the parties. Among the items of default listed by appellants were (1) respondents' failure to make a $13,000 contract payment due November 30, 1970, (2) failure to maintain adequate records sufficient to determine the financial position of the corporation, (3) failure to timely pay debts, taxes and leases of the corporation, and (4) failure to keep payment of insurance premiums current.

Respondents made their $13,000 contract payment December 24, 1970, but did not cure their other defaults within the allotted 30 days. On January 6, 1971, appellants notified respondents that Hesperian Orchards corporate stock which was being purchased by respondents, and which was then held as security for payment of its full purchase price, would be disposed of at a public auction sale on February 9, 1971. Respondents made no objection to the February 9 sale. At the public auction, appellant-sellers bid for the stock against other independent private parties and ultimately purchased the stock for $120,000.

A deficiency of $115,000 plus interest was yet owing by respondents on the stock purchase contract. Sellers then went into Superior Court seeking two remedies. They sought a deficiency judgment of $115,000 plus interest pursuant to the express terms of the April 13 agreement

between the parties and as provided for in RCW 62A.9-504(2)[1] and a judicial foreclosure of respondents' supplemental real estate mortgage given to appellants pursuant to the terms of the April 13 modification agreement.

The trial court found that (1) sellers held the Hesperian Orchards stock as security for payment of the purchase price of the stock; (2) the mortgage on purchasers' real estate was given to sellers as additional security for the stock purchase; (3) sellers gave purchasers adequate notice to cure defaults or sellers would accelerate the purchase obligation; (4) purchasers had actual knowledge of the public auction and sale of the stock; and (5) at the time of the public auction the purchasers were in default on their purchase agreement. The trial court also made conclusions of law that (1) the manner in which the stock was publicly auctioned, the foreclosure of the purchasers' interest in it, and the manner of giving notice of sale were reasonable; and (2) the purchasers, by their inaction prior to the stock auction, waived their right to object to the sale.

The record discloses ample evidence in support of these findings of fact.

The trial court, however, also held that "equity" would not allow sellers a deficiency judgment against respondent-purchasers on the stock purchase contract, and foreclosure of respondents' real estate mortgage was held in abeyance for 6 months. The stated grounds were:

> Because of the absence of testimony of *substantial* default, the harsh prayer for deficiency judgment will not be granted . . . To grant such a prayer on the basis of the entire evidence herein would be unjust and inequitable.

(Italics ours.)

The trial court's error derives principally from its misap-

---

[1]RCW 62A.9-504(2). "If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides."

prehension of the role lawfully allocated to it in its administration of justice to disputing contracting parties before it. Because of the way a court exercises its powers, it cannot escape assuming a role in the litigation. Courts are constantly engaged in recognizing and defining competences and asserting managerial competences of their own. Each such decision bears a dual aspect: (1) that of defining the court's own role and, by necessary implication, that of the parties, and (2) that of playing the role which the court has assigned to itself. This is a question of allocation of competences fundamental to our state law. Although the question of competences most frequently arises when courts are called upon to resolve conflicts between levels or branches of government, the issue is no less relevant when the conflict is between private and public authority. *See* Jaffe, *Law Making by Private Groups*, 51 Harv. L. Rev. 201 (1937). Recently the United States Supreme Court addressed itself to a similar role-allocation issue in *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 36 L. Ed. 2d 772, 93 S. Ct. 2080 (1973). There the court described the question for decision as that of who shall determine what issues are to be discussed over network television by whom, and acknowledged its responsibility for resolving that question. Thus, law may be characterized as a union of primary rules governing conduct and secondary rules designating the authoritative source of primary rules. H. Hart, *The Concept of Law* 77-96 (1961).

■ There are two questions which a court must first resolve before it may determine whether a contracting party to a dispute has breached its obligation to another. First, a court must inquire as to whether there is any basis for refusing to enforce the contract made by the parties or whether a party has asserted valid affirmative defenses to the formation of the contract. This inquiry leads the court into a consideration, among others, of whether there is before it (1) a statute of frauds problem, (2) a lack of contractual capacity, (3) an illegal contract, (4) a contract

induced by fraud, mutual mistake of material fact, duress, or (5) a contract of adhesion. *See* text and collected cases in *Williston on Contracts,* §§ 450, 677A, 1487A, 1578A, 1602, 1617 (3d ed. W. Jaeger 1960).

▮▮ When the court determines there is no basis for refusing to enforce the contract made by the parties, it must next examine the contract itself to determine what events and conduct of the parties the contracting parties intended, by their contract, to define their mutual obligations. At this stage of the inquiry, the role of a court sitting without a jury is that of a fact finder. It must determine whether any of the events of default, specified by the parties in their contract, have occurred. Once a court has made findings of fact that events of default have occurred, as here, it must grant the nondefaulting party the remedies contracted for and permitted under our constitutions, statutory and common law. At this juncture a court is without legal power to interpose its judgment for that of the parties as to whether or not the remedies contracted for are more harsh than accord with its own sensibilities. An event of default is, within reason, what the parties have agreed in their contract that it would be and not what a court, exercising its own judgment, thinks it ought to be. *See* 2 G. Gilmore, *Security Interests in Personal Property* § 43.3, at 1193 (1965).

In this case the trial court erred because it assumed a role not proper to it. The trial court substituted its judgment for that of the parties by engaging in an "interest balancing" which exceeded its power. A court's power to adjudicate the rights and duties of parties to a contract is determined by the legislative framework within which the parties have contracted, the agreement between the parties, and the common-law doctrines which bear upon the parties' mutual exercise of their freedom of contract. Neither this court nor a trial court may make a new contract for the parties. Courts have the lawful power only to enforce the contract which the parties have made for themselves.

*Spokane Sav. & Loan Soc'y v. Park Vista Improvement Co.,* 160 Wash. 12, 294 P. 1028 (1930). Here both the legislature and the parties themselves have clearly expressed their intentions. The parties agreed that the purchasers' real estate should be mortgaged to sellers as security for the underlying stock sale contract. They also agreed that remedies allowed under the U.C.C. would bind the parties, and that the events of default were as specified. The concern of the trial court seems to have been with the "justice" of allowing the nondefaulting sellers to both realize on their security *and* seek a deficiency judgment. The "justice" of the agreement could be resolved in favor of the sellers when it is understood that the orchard they sold was worth substantially less after sale than the original purchase price, as a result of freeze damage. This is an unsatisfactory way, however, to resolve the dispute.

Under RCW 62A.9-501-507, a creditor may choose between two basic methods of obtaining the benefit of his bargain from a defaulting debtor. Where, as here, no purchase of consumer goods is involved, the creditor may seize the goods subject to his security interest and either keep them in satisfaction of the debt (RCW 62A.9-505(2)), or resell them and apply the proceeds to the debt (RCW 62A.9-504(1)), in which latter case the debtor is liable for any deficiency. RCW 62A.9-504(2). Alternatively, the creditor may ignore his security and obtain a judgment on the underlying obligation and proceed by execution and levy, in which case the judgment lien relates back to the date of the perfection of the security interest in the collateral. RCW 62A.9-501(5). Under pre-Code law, courts often held that a suit on the debt was inconsistent with a creditor's claim that he retained title to the goods under a conditional sales contract. 113 A.L.R. 653 (1938).

This election of remedy issue arose first under the U.C.C. in *In re Adrian Research & Chem. Co.,* 269 F.2d 734 (3d Cir. 1959). There the court, under an early version of the Code, held that an execution on the debt was not inconsistent with a later claim under the security agreement. The

current version of the Code expressly allows both an action on the underlying obligation and a claim against the collateral securing the debt. RCW 62A.9-501(5).[2] RCW 62A.9-501(1) further provides that "[t]he rights and remedies referred to in this subsection are cumulative."

The meaning of RCW 62A.9-501(1) and (5) is clear and unambiguous. This case does not require statutory interpretation as the language is plain and admits of no more than one meaning. *Krystad v. Lau*, 65 Wn.2d 827, 400 P.2d 72 (1965).

Those statutes permit the nondefaulting party to reduce his claim to judgment, foreclose, or otherwise enforce the security interest by any available judicial procedure. These rights and remedies are expressly made "cumulative." Referring to these sections in article 9 of the U.C.C., Professor Gilmore states: "If drafting can do the job, this forthright statement should put the issue to rest once and for all. Nothing the secured party may do to collect his debt through the process of the law courts will operate to destroy his security interest vis-a-vis the debtor or to impair its priority over third parties . . . It would be oversanguine to hope that §9-501 in its final version will, despite its forthrightness, put an end to the argument. The election of remedies doctrine is dear to the hearts of many lawyers and procedural reforms are always bitterly resisted. We may assume that the argument will continue to be made that the action on the debt bars a later resort to the security. It is, however, hard to imagine that the argument can be successful if the provisions of §§9-501(1) and (5) are effectively presented to the court." (Footnotes omitted.) 2

---

[2]RCW 62A.9-501(5). "When a secured party has reduced his claim to judgment the lien of any levy which may be made upon his collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral. A judicial sale, pursuant to such execution, is a foreclosure of the security interest by judicial procedure within the meaning of this section, and the secured party may purchase at the sale and thereafter hold the collateral free of any other requirements of this Article.".

G. Gilmore, *Security Interests in Personal Property* § 43.7, at 1209-10 (1965). We agree with Professor Gilmore.

RCW 62A.9-502(2) states: "If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency." Professor Gilmore comments, at page 1231, that "the secured party's right to claim for any deficiency is automatic unless, as the draftsmen remark in an excess of caution, otherwise agreed." We agree. In an abundance of caution the security agreement before us here expressly provided for the nondefaulting secured party's right to a deficiency judgment. However, this right of the nondefaulting secured party to a deficiency judgment is subject to the limitations imposed by RCW 62A.9-504(3) and RCW 62A.9-507(1). "[E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." RCW 62A.9-504(3). This requirement is mandatory and is not subject to disclaimer or limitation.

Courts have often formulated the duty of a pledgee or mortgagee who sells collateral after default in terms of a fiduciary obligation. "Equity assigns to pledgor and pledgee a trust relationship with resulting obligations on the pledgee . . . One of those obligations (on mortgagee and pledgee) is to 'use every effort to sell the estate under every possible advantage of time, place, and publicity' (Perry on Trusts and Trustees [4th ed.], § 602o;" *In re Estate of Kiamie*, 309 N.Y. 325, 330, 130 N.E.2d 745 (1955). The secured party's paramount obligation under article 9 is to act in a "commercially reasonable" manner. The last sentence of RCW 62A.9-507(2) provides that any disposition "shall conclusively be deemed to be commercially reasonable" if it "has been approved in any judicial proceeding . . . ." In this case no judicial approval of the sale of stock was sought prior to sale as, indeed, none was required, but as noted earlier the trial court made a conclusion of law that the sale was reasonable.

■ A sale of collateral in which the secured party partic-ipates as a purchaser and for which there is no recognized market, as here, is "in conformity with reasonable commercial practices," RCW 62A.9-507(2), if certain conditions are met. The sale is valid where notice of the sale is (1) given to the defaulted debtor and to the public sufficiently in advance to allow interested bidders a reasonable opportunity to participate, (2) given to a "public" reasonably expected to have an interest in the collateral to be sold and notifying the public of the exact time of sale and place of sale, reasonably convenient to potential bidders, (3) sufficiently replete with information describing the collateral to be sold and the amount of the obligation for which it is being sold to allow potential bidders a genuine opportunity to make an informed judgment as to whether to bid at the sale, and (4) published in a manner reasonably calculated to assure such publicity that the collateral will bring the best possible price from the competitive bidding of a strived-for lively concourse of bidders. If a sale is conducted under these circumstances, "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." RCW 62A.9-507(2). The secured party is not required to anticipate the course a market will take. He is required to use his best efforts to sell the collateral for the highest price and to have a reasonable regard for the debtor's interests. The record before us supports the trial court's finding that the secured party's sale of collateral was "in conformity with reasonable commercial practices." RCW 62A.9-507(2).

The trial court's refusal to grant to appellants an immediate judicial foreclosure of the supplemental mortgage given by respondents as further security for the sale of stock was error. This supplemental mortgage on all of respondents' real property in the state of Washington was freely bargained for and went to the inducement of the amended purchase and security agreement between the

parties. There have been instances where judicial relief, arising out of a claimed equity jurisdiction, has been granted to avoid the severe hardships to a defaulting mortgagor of a judicial foreclosure and sale of real property during a widespread staggering economic depression. *Suring State Bank v. Giese,* 210 Wis. 489, 246 N.W. 556, 85 A.L.R. 1477 (1933). The United States Supreme Court, on the other hand, has held that a depreciation in real estate values is not sufficient reason for refusing to uphold a foreclosure and sale under a trust deed. *Smith v. Black,* 115 U.S. 308, 29 L. Ed. 398, 6 S. Ct. 50 (1885). These issues are not before us now. We hold on the issues presented by this case that absent such supervening events, where parties competent to contract have freely bargained for a mortgage on property as supplemental security to a secured transaction and where the mortgagor is in default of his underlying obligation, the role of the trial court is to enforce the agreement between the parties, including any supplemental mortgages. The court should not, under the facts of this case, intrude its substantive judgment as to whether or not the terms of that agreement were too severe. The trial court's order, holding foreclosure of the respondents' real estate mortgages in abeyance for 6 months contrary to the express agreement of the parties, was error.

Respondents/cross-appellants' remaining assignments of error are not supported by the findings of fact and the record in the case does not compel a conclusion in respondents' favor as a matter of law. The findings of fact and conclusions of law insofar as they derogate from the agreement of the parties, do not support the court's failure to enter the full deficiency judgment or to allow foreclosure of the supplemental mortgages. The court below is directed to grant the deficiency judgment and immediate foreclosure of the supplemental mortgages.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.