651 F.Supp. 68 (1986)
GNG XI, INC., Plaintiff,
v.
QUIXOTI CORPORATION, The Caring Group, Inc., Martin Plotkin, Defendants.
No. 85-1262C(6).
United States District Court, E.D. Missouri.
September 11, 1986.
*69 Jeffrey J. Kalinowski, Martin P. Zucker, Peper, Martin, Jensen, Maichel & Hetlage, Daniel P. Card, Love, Lacks & Paule, St. Louis, Mo., for plaintiff.
Richard Hokamp, Phil Morgan, Samuel E. Ebling, Gallop, Johnson & Neuman, St. Louis, Mo., for defendants.

MEMORANDUM
GUNN, District Judge.
This case is before the Court on the motion of defendant-counterclaimants Quixoti Corporation (Quixoti) and The Caring Group, Inc. (Caring) for summary judgment on Counts I and II of their first amended counterclaim. Count I seeks a declaration that plaintiff GNG XI, Inc. (GNG) is in default under the Sale Agreement giving rise to this suit and that, in consequence of the default and pursuant to the agreement, counterclaimants are entitled to foreclose upon corporate stock pledged by GNG to secure its obligations under the agreement. Count II seeks a declaration that certain options and agreements for transfer of stock entered into by GNG and defendants as part of the Sale Agreement are null and void pursuant to provisions of that agreement.
The Court has carefully reviewed the pleadings and the evidence submitted by the parties and now finds that no genuine dispute exists as to any fact material to counterclaimants' right to judgment on their motion. Plaintiff has defaulted under the terms of the Sale Agreement, and counterclaimants are entitled to foreclose upon the corporate stock as a matter of law. Rule 56, Fed.R.Civ.Pro.
This case arises out of the 1982 sale of six nursing homes[1] by Quixoti and Caring to GNG. The homes are wholly-owned subsidiaries of Medigroup Enterprises, Inc. (MEI), and the 1983 negotiations between GNG and Quixoti[2] culminated in an *70 "Agreement for Sale of Corporate Stock of Medigroup Enterprises, Inc." (the Agreement) and related documents. The Agreement provided for the acquisition by GNG of all the stock of MEI for a purchase price of $2.5 million dollars. GNG was to make an initial cash payment of $1.25 million dollars, the balance to be paid according to the terms of a contemporaneously executed promissory note secured by a pledge of the MEI stock to counterclaimants. It is counterclaimants' rights under the security agreement that are at issue on the instant motion.
Plaintiff has been in possession of and has managed the six homes through a contract with CIHS since January 31, 1984. Counterclaimants Quixoti and Caring assert that GNG has breached several of the covenants and warranties set out under section 18 of the Agreement, placing it in default under the terms of section 31 and giving rise to an absolute right to Quixoti and Caring under the latter section to foreclose upon the pledged collateral. Section 31 also by its terms operates upon default by the purchaser GNG to void the options and assignments subject of Count II of the counterclaim.
Plaintiff originally filed suit in this Court on June 3, 1985. In its original complaint, GNG sought ex parte temporary injunctive relief restraining Quixoti and Caring from foreclosing on the property upon an assertion of failure by GNG to make a payment on the promissory note. This Court granted a temporary restraining order on that date in consideration of the disruption in care to residents of the homes that plaintiff averred would follow the disputed foreclosure. Since that date, plaintiff has twice amended its complaint to allege federal securities and common law fraud as well as breach of contract. Defendants filed a six-count counterclaim, of which three counts have been voluntarily dismissed. The core of the action continues to be possession of the MEI stock. The Court having considered the Agreementin particular the section 18 warrantiesand the evidence of breach by GNG presented by defendants now finds GNG to be in default and concludes that, pursuant to the Agreement, counterclaimants are entitled to repossess the stock.
Section 400.9-102(1)(a), RSMo (1978), provides that Article 9 of the Uniform Commercial Code shall apply "to any transaction (regardless of its form) which is intended to create a security interest in ... instruments." "Instrument," as defined in § 400.9-105(g), includes a "security" as defined in § 400.8-102(a). This Court has no difficulty finding that the MEI stock meets the § 400.8-102(a) definition and, hence, that Article 9 provides the governing law in this case.
Article 9 does not define "default," leaving this task to the parties. "Apart from the modest limitations imposed by the unconscionability doctrine and the requirement of good faith, default is `whatever the security agreement says it is.'" J. White & R. Summers Uniform Commercial Code § 26-2, at 956 (1972); citing Borochoff Properties, Inc. v. Howard Lumber Co., 115 Ga.App. 691, 155 S.E.2d 651, 4 U.C.C. Rep. 229 (1967). The Agreement at issue in this case sets forth under § 18 multiple covenants and warranties running from the purchaser to the seller, breach of any one of which gives rise to a right in the seller to pursue its remedies on default as set forth in § 31 of the Agreement.
Section 18 ¶ (a)(i)[3] provides to sellers a right to inspection of the nursing home premises during business hours upon *71 receipt by purchaser of forty-eight hours notice. The record contains two letters from counsel for GNG and portions of deposition testimony of Judy Mincher and Riley Nelson establishing that GNG has refused to permit such inspections at least since the filing of this suit in clear breach of the Agreement.
Plaintiff's argument that the entry by this Court of the Temporary Restraining Order enjoining defendants from foreclosure operated to deprive defendants of their rights under the Agreement is unreasonable. The restraining order held the parties in status quo, and plaintiff cannot in good faith assert its rights under the Agreement while simultaneously seeking to bar defendants from exercising theirs.
Plaintiffs suggestion that during the pendency of the litigation inspections could only take place pursuant to a Rule 34, Fed.R.Civ.Pro., order is without merit. Defendants had a right under the Agreement to inspect the premises without a court order. Plaintiff did not have a right to bar their entry.
Plaintiff does not dispute the fact that it would not permit inspection. This Court concludes that this refusal constituted a breach of § 18 ¶ (a)(i) of the Agreement.
Section 18 ¶ (c)[4] of the Agreement reserves to the sellers the liabilities and benefits arising from the operation of the homes prior to October 31, 1983. Specifically, the section provides for collection by the sellers of all accounts receivable arising from such operation. Counterclaimants assert and offer deposition testimony[5] to establish that GNG was withholding such accounts from Quixoti and Caring.
Plaintiff argues that its retention of the amounts in question constituted a justifiable set-off against liabilities incurred by counterclaimants as a result of their failure to perform certain obligations under the Agreement. In support of its argument plaintiff filed with the Court portions of the deposition of defendant Plotkin in which he testified that money was owed on both sides of the transaction. This testimony by Plotkin does not support a finding that any settlement had been achieved that would permit plaintiff to retain moneys belonging to counterclaimants under the terms of the Agreement. Absent such a settlement agreement or other approved mediation of mutual obligations, plaintiff's concealment of the funds was unjustified and in breach of § 18 ¶ (c).
Section 18 ¶ (a)(iii)[6] warrants that the purchaser will not incur any indebtedness or contractual right which is convertible into indebtedness. Counterclaimants have presented evidence uncontroverted by plaintiff that GNG guaranteed loans made by Scotiabank to CIHS and thereby breached this warranty provision of the Agreement.
Plaintiff's obligation under the Guarantee is "a primary, absolute and unconditional" guarantee of payment of all loans and other present and future liabilities of CIHS. Upon default by CIHS, the guarantee provides that the Bank is authorized to proceed directly against plaintiff for the full amount of the loan. The Court is satisfied that the Guarantee constitutes an indebtedness in violation of § 18 ¶ (a)(iii).
Plaintiff argues that even if the Guarantee violates a warranty provision of the Agreement, GNG should not be found *72 in default because the CIHS loan was otherwise adequately secured such that GNG would never be called upon to perform under the Guarantee. Where an action by the borrower constitutes a default under the clear terms of a security agreement, the Court will give the agreement effect in accordance with those terms. Gorham v. Denna, 22 U.C.C.Rep. 1066 (Mich.App. 1977) ("[I]f a security agreement is to be truly effective according to its terms, any act performed by the debtor in clear contravention of those terms must give the creditor a right to statutory and agreed upon remedies whether he suffered a pecuniary loss or not.")
Counterclaimants have presented evidence to the Court that plaintiff is in violation of additional warranties under § 18 pertaining to licenses and government contracts. The Court will not examine these claims and plaintiff's defenses at length, having concluded that any single breach of a § 18 warranty triggers the § 31 right to foreclosure relief.
In addition to its specific defenses to counterclaimants' assertions of breach of the Sale Agreement, plaintiff raises three general arguments in opposition to counterclaimants' motion. First, plaintiff asserts that counterclaimants are not entitled to enforce the Agreement because they were the first to breach it; second, plaintiff argues that the continued acceptance by counterclaimants of payments on the note constituted a waiver of objection to any default or breach by plaintiff; and third, plaintiff contends that even if the Court were to find a clear breach of the Agreement it would not constitute a default under the Agreement because the value of the collateral was not thereby impaired. None of these arguments is persuasive.
The general contract principle that a party who has first breached a contract cannot sue for enforcement against the innocent party has no application to the instant case. That principle supports a suit for rescission of contract on the ground that a material breach has destroyed the value of the bargain. Plaintiff GNG does not seek to rescind the Sale Agreement but rather seems to argue that counterclaimants' earlier breach entitles plaintiff to enjoy the benefit of the contract without further obligation to perform. Such an argument is unsupportable. Plaintiff had an independent and absolute obligation to pay under and comply with the terms of the security agreement that was not contingent upon counterclaimants' perfect performance. The remedy for breach in a case in which the party claiming breach seeks to maintain the contract is in damages. See Honeywell Information Systems, Inc. v. Demographic Systems, Inc., 396 F.Supp. 273 (SDNY 1975) (seller of data processing equipment entitled to repossession upon failure of purchaser to make note payment although purchaser claimed defective performance).
Similarly, plaintiff's claim that counterclaimants waived their right to assert default because they continued to accept note payments is without merit. Section 27 of the Sale Agreement unambiguously provides that no waiver shall be effective unless in writing and executed by the party against whom it is asserted. Section 27 also provides that acceptance of default on one occasion does not constitute a waiver of the right to assert default on subsequent failures to perform.
Furthermore, counterclaimants' acceptance of payments on the note cannot support a finding of waiver absent clear evidence of intent to waive performance of other obligations. Counterclaimants' conduct in this litigation provides clear indication of the contrary: a refusal to relinquish rights to performance under the Agreement. See Gorham, supra at 1070, n. 3 (continued acceptance of installment payments while pursuing foreclosure does not constitute waiver of right to foreclose).
Finally, the Court rejects plaintiff's argument that none of its alleged defaults, if proven, should give rise to a right to foreclose because they in no way impaired the collateral. Article 9 does not recognize "technical" defaults. Gorham, 22 U.C.C. *73 Rep. 1066; see also Foster v. Knutson, 84 Wash.2d 538, 527 P.2d 1108, 15 U.C.C.Rep. 1127 (1974) (trial court limited, in reviewing security agreement, to determining whether events of default occurred without evaluation of how substantial they were).
In conclusion, the Court finds that the undisputed facts establish that plaintiff GNG has breached the express warranties of § 18 of the Sale Agreement in its refusal to permit inspection of the nursing homes, in its concealment from counterclaimants of accounts receivable, and in its guarantee of a loan to CIHS by Scotiabank. These defaults give rise to a right in Quixoti and Caring to foreclose upon the corporate stock of MEI as a matter of law.

ORDER
Pursuant to the memorandum filed herein on this date,
IT IS HEREBY ORDERED that the motion of counterclaimants Quixoti Corporation and The Caring Group, Inc. for summary judgment on Counts I and II of their counterclaim be and it is granted.
Plaintiff GNG XI, Inc. is hereby declared to be in default under the Sale Agreement and related documents and Quixoti Corporation and The Caring Group, Inc. are entitled to foreclose upon the pledged stock of Medigroup Enterprises, Inc. and its six wholly-owned subsidiaries.
The options and agreements entered into between GNG XI, Inc. and defendants as part of the Sale Agreement are hereby declared null, void and of no force and effect pursuant to the provisions of the Sale Agreement.
In light of this ruling,
IT IS FURTHER ORDERED that defendants are entitled to judgment as a matter of law on Count I of plaintiff's first amended complaint.
IT IS FURTHER ORDERED that defendants' motion for partial summary judgment be and it is denied.
NOTES
[1] The six homes are Professional Care Centers Oak Park, Inc. (Oak Park), Professional Care Centers Heritage Park, Inc. (Heritage), Professional Care Centers North Village Park, Inc. (North Village), Professional Care Centers Castle Park, Inc. (Castle Park), Professional Care Centers Chariton Park, Inc. (Chariton) and Professional Care Centers Westwinds Park (Westwinds).
[2] Plaintiff GNG XI, Inc. was formed with the express purpose of acquiring the six nursing homes that are the subject of this suit. It is one of a number of "GNG" companies that own nursing homes, all of which are run under contract by Canadian International Health Services, Inc. (CIHS). Riley H. Nelson is president of all the GNG companies and CIHS.

Negotiations on behalf of Quixoti for the sale of the homes were undertaken by Martin Plotkin, president of Quixoti and a named defendant in this suit.
[3] Subsection (i) provides:

SELLERS and their employees and representatives (with forty-eight (48) hours' prior notice to PURCHASER unless SELLERS have reasonable cause to believe that there exist conditions which may violate the terms hereof, in which event no prior notice need be given) shall have the right during each FACILITY's normal business hours, without interfering or disrupting the business of the FACILITY, to inspect that particular FACILITY for the purpose of ascertaining PURCHASER's compliance with the terms hereof.
[4] Subsection (c) provides:

The parties understand and agree that subsequent to closing SELLERS shall continue to be liable for all obligations and shall have all of the benefits, including the collection of all accounts receivable, arising from the operation of any of the FACILITIES on or before October 31, 1983....
[5] Depositions of Trudy Cohen and Terry Dooling, Exhibits O and P, in support of counterclaimants' motion.
[6] Subsection (iii) provides:

PURCHASER will not and will not cause or permit MEI or any NURSING FACILITY OPERATOR to: issue or incur any capital stock or indebtedness or any contractual right which is convertible into any capital stock or indebtedness. ...