CALVIN BOENDER, Plaintiff and Counterdefendant-Appellee, v. CHICAGO NORTH CLUBHOUSE ASSOCIATION, INC., Defendant and Counterplaintiff-Appellant.

First District (2nd Division) No. 1—92—0738

Opinion filed December 15, 1992.

Mack P. Manning, of Chicago, for appellant.

Barnett, Bornstein & Blazer, Ltd., of Chicago (Michael S. Blazer, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Counterplaintiff, Chicago North Clubhouse Association, Inc. (Clubhouse), an Illinois not-for-profit corporation, appeals the dismissal of its second amended counterclaim, which alleges that counterdefendant, Calvin Boender (Boender), violated section 9—504 of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1991, ch. 26, par. 9—504 (section 9—504)) by selling collateral in a commercially unreasonable manner. No other cause of action remains between the parties. The issues raised on appeal include whether (1) the dismissal was procedurally and substantively proper; and (2) a secured creditor is liable to the debtor for the surplus after the sale of property under the facts of this case.

Clubhouse, in its second amended counterclaim count II (second amended counterclaim), pleaded that Boender, a commercial land developer, as purchaser, and Clubhouse, as seller, executed a real estate sale contract for the property located at 1925 West Thome Avenue in Chicago, at a price of $550,000. The parties never closed the deal, however, because of a contract dispute. Nevertheless, Boender assumed exclusive physical possession of the property before September of 1988 without Clubhouse's permission. On October 10, 1988, Boender allegedly executed a second real estate sale contract, agreeing to sell the property to Unity Church of Chicago (Unity Church) for $950,000.

Boender sued Clubhouse for specific performance of their contract on December 22, 1988. While Boender's suit was still pending, he acquired a collateral security interest in the property: For payment of $144,039.51, Uptown National Bank of Chicago assigned to Boender the collateral of 100% beneficial interest in a land trust and two notes evidencing Clubhouse's debt to the bank. The land trust corpus consisted of the clubhouse and realty on Thome.

Boender demanded payment of the notes from Clubhouse in a letter dated April 17, 1989. After Clubhouse failed to pay the $151,960.07, including interest, due under the notes, Boender mailed Clubhouse and its attorney a "Notice of Public Sale of Collateral Under the Uniform Commercial Code," dated April 25, 1989. Boender scheduled the sale for 10 a.m. on May 8, 1989, at his attorney's law office in Chicago.

Boender set the following terms of public sale: (1) public bidding, oral or written; (2) each bidder must have deposited a $50,000 cashier's check with Boender prior to bidding; (3) Boender, as seller, exempted himself from the $50,000 deposit requirement; and (4) the successful bidder must pay the balance of the sale price within 24 hours. Boender published a notice to this effect in the Chicago Daily Law Bulletin, which ran on April 27 and 28, and from May 1 through May 5.

On May 5, 1989, Clubhouse moved for a temporary restraining order to enjoin Boender from proceeding with the sale because it would violate section 9—504. The circuit court denied the motion without prejudice to Clubhouse's right to challenge the commercial reasonableness of the sale.

At the public sale on May 8, 1989, Boender bid the debt owed him and took title to the property. Clubhouse did not appear at the sale because it did not have $50,000 to deposit prior to bidding. The day after he purchased the property at the UCC sale, Boender caused a trustee's deed to be delivered to Unity Church. Boender made approximately $800,000 in profit on the transaction.

Clubhouse filed an amended counterclaim against Boender charging a violation of section 9—504. Boender's motion to strike and dismiss the amended counterclaim was granted, but Clubhouse was given 28 days to refile.

Clubhouse filed its second amended counterclaim with leave of court on January 10, 1991. The second amended counterclaim, in addition to pleading the facts first noted, added the following allegations. First, the property involved was unique realty without a known market, and therefore the public notice that Boender provided of its sale was insufficient and violative of his fiduciary duties as a Clubhouse secured creditor. Second, the Chicago Daily Law Bulletin is circulated mainly to lawyers and does not have a known circulation among realtors, brokers or real estate investors; consequently, Boender was obligated to advertise the public sale more widely. Third, notice to a *bona fide* audience "might well have evoked" interest in the property because the beginning bid of $155,000 was so low. Fourth, because of

Boender's real estate sale contract with Unity Church, he was unable to sell the property to a third party at the public sale without incurring a liability to Unity Church; therefore, Boender was unable to conform the public sale with the requirements of section 9—504. Fifth, Boender intentionally used the $50,000 deposit requirement to exclude Clubhouse (which he knew did not have $50,000), from attending the public sale "even as an observer."

Boender's motion to dismiss the second amended counterclaim was granted with prejudice, the court finding that Boender's subsequent sale of the property to Unity Church was separate from the UCC sale.

Clubhouse motioned for a rehearing, which was denied, the court finding the following: (1) Clubhouse could have requested a waiver of the $50,000 deposit requirement at the hearing on the motion for the temporary restraining order, but failed to do so; (2) the notice in the Chicago Daily Law Bulletin was adequate and published; (3) Boender's subsequent sale of the property was separate from the UCC sale; and (4) a low price obtained at the UCC sale does not in itself establish that the sale was commercially unreasonable.

Clubhouse appeals from the dismissal with prejudice of its second amended counterclaim and the order denying its motion for a rehearing.

## I

■ Clubhouse initially argues that Boender's motion to dismiss does not identify its procedural basis; however, section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—615) is referenced in the motion, which Boender acknowledges in his brief. There was no error.

## II

■ Clubhouse next asserts that Boender's use of a motion to strike followed by a motion to dismiss is a hybrid motion, relying upon *Janes v. First Federal Savings & Loan Association* (1974), 57 Ill. 2d 398, 312 N.E.2d 605, *Bejda v. S G L Industries, Inc.* (1980), 82 Ill. 2d 322, 412 N.E.2d 464, *Eddings v. Dundee Township Highway Commissioner* (1985), 135 Ill. App. 3d 190, 478 N.E.2d 888, and *Premier Electric Construction Co. v. La Salle National Bank* (1983), 115 Ill. App. 3d 638, 450 N.E.2d 1360. These cases do not support Clubhouse's contention. The section 2—615 motion, although entitled a motion to dismiss, in reality contained both a motion to strike the pleading and a motion to dismiss, which section 2—615 contemplates

within its terms, and was considered in two stages. (See 3 R. Michael, Illinois Practice §27.2, at 493 (1989).) The section 2—615 motion to dismiss was not an improper hybrid motion.

### III

The heart of Clubhouse's contentions is that the second amended counterclaim sufficiently states a cause of action for Boender's violation of section 9—504 of the UCC. The standard of review on appeal from a motion to dismiss a complaint is whether the complaint sufficiently states a cause of action; the merits of the case are not at issue. *McCormick v. Kruk* (1991), 220 Ill. App. 3d 449, 451, 581 N.E.2d 73.

■ Clubhouse correctly notes that a section 2—615 motion to dismiss admits as true all well-pleaded facts (*Aguilar v. Safeway Insurance Co.* (1991), 221 Ill. App. 3d 1095, 1100, 582 N.E.2d 1362; *Willard v. Northwest National Bank* (1985), 137 Ill. App. 3d 255, 260, 484 N.E.2d 823) and inferences that reasonably could be drawn therefrom. (*Duncan v. Rzonca* (1985), 133 Ill. App. 3d 184, 190, 478 N.E.2d 603.) Boender responds that a pleading is subject to dismissal if the underlying allegations are insufficient. It is true that a section 2—615 motion to dismiss does not admit conclusions of law or fact which are unsupported by allegations of specific facts warranting such conclusions (*Groenings v. City of St. Charles* (1991), 215 Ill. App. 3d 295, 299, 574 N.E.2d 1316); however, each separate paragraph of a count need not state a cause of action. Only where the entire count fails to state a cause of action should it be dismissed pursuant to section 2—615. *Austin View Civic Association v. City of Palos Heights* (1980), 85 Ill. App. 3d 89, 103, 405 N.E.2d 1256.

■ Section 9—504 provides the secured party the right to sell collateral after default. It imposes two requirements upon the selling secured party: first, "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable"; and second, "reasonable notification" must be sent to the debtor. (Ill. Rev. Stat. 1991, ch. 26, par. 9—504(3). See 2 J. White & R. Summers, Uniform Commercial Code §25—9, at 1214 (3d ed. 1988).) In Illinois, the secured creditor, here Boender, has the burden of proving commercial reasonableness. (*Commercial Discount Corp. v. Bayer* (1978), 57 Ill. App. 3d 295, 301, 372 N.E.2d 926; *General Foods Corp. v. Hall* (1976), 39 Ill. App. 3d 147, 153, 349 N.E.2d 573.) Commercial reasonableness is normally an issue of fact (*Pioneer Bank & Trust Co. v. Mitchell* (1984), 126 Ill. App. 3d 870, 873-74, 467

N.E.2d 1011), ill-suited to disposition by dismissal. *Willard v. Northwest National Bank* (1985), 137 Ill. App. 3d 255, 263, 484 N.E.2d 823.

In the case *sub judice*, Clubhouse has adequately pleaded facts underlying its claim against Boender for a violation of section 9—504 by selling collateral in a commercially unreasonable manner, and the circuit court's decision to the contrary was error. Clubhouse claims that Boender conducted a UCC sale in which he sold Clubhouse's collateral consisting of a beneficial interest in a land trust.[1] Before the UCC sale, Boender had executed a contract to resell Clubhouse's collateral to a third party, Unity Church, for $950,000. Yet, Boender purchased the collateral at the UCC sale for less than $155,000. The next day he fulfilled his contract with Unity Church, thereby earning a profit of approximately $800,000. Further, Clubhouse claims that the notice of public sale published in the Chicago Daily Law Bulletin was inadequate because it failed to attract potential bidders. For the purpose of the motion, these facts are pleaded sufficiently to be accepted as true. The claim advanced by Clubhouse is that the collateral here was uniquely improved realty and the market solicited (through the Chicago Daily Law Bulletin) was not recognized for such property; that the price secured at the UCC sale demonstrably was not current in the market, witness the real estate contract executed for six times the bid-in price by the secured party, who was both the seller under that contract and the sole bidder at the sale; and that the sale, therefore, was not commercially reasonable.

■ The mere fact that a better price could have been secured at a sale conducted at a different time or utilizing a different method from that pursued by a secured party is not of itself sufficient to demonstrate that a sale was not made in a commercially reasonable manner, and "[i]f the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner." (Ill. Rev. Stat. 1991, ch. 26, par. 9—507(2).) Nevertheless, where the secured party purchases the collateral at the sale for a price well below the fair market value, a court must closely scrutinize

---

[1]A collateral assignment of a beneficial interest in a land trust, as here, creates a security interest in personal property which is amenable to a UCC foreclosure sale. *Commercial National Bank v. Hazel Manor Condominiums, Inc.* (1985), 139 Ill. App. 3d 644, 646-48, 487 N.E.2d 1145; *Slovick v. All American Bank* (1987), 163 Ill. App. 3d 741, 744, 516 N.E.2d 947.

the circumstances surrounding the sale to determine if it was commercially reasonable and not the result of self-dealing. *Leasing Service Corp. v. Broetje* (S.D.N.Y. 1982), 545 F. Supp. 362, 368; *Associates Capital Services Corp. v. Riccardi* (D.R.I. 1978), 454 F. Supp. 832, 834; *Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co-Alaska, Inc.* (Alaska 1977), 568 P.2d 1007, 1011.

■ It is well established that the secured party is required to exercise due diligence to sell the collateral for the best price obtainable and to have a reasonable regard for the debtor's interest. (*Dynalectron Corp. v. Jack Richards Aircraft Co.* (W.D. Okla. 1972), 337 F. Supp. 659, 663; *Savage Construction, Inc. v. Challenge-Cook Brothers, Inc.* (1986), 102 Nev. 34, 714 P.2d 573, 574-75; *Foster v. Knutson* (1974), 84 Wash. 2d 538, 548, 527 P.2d 1108, 1115; *Morris Plan Co. v. Johnson* (1971), 133 Ill. App. 2d 717, 721, 271 N.E.2d 404.) The court may consider the knowledge or capability of the secured party in examining the circumstances of the sale. (*Connex Press, Inc. v. International Airmotive, Inc.* (D.D.C. 1977), 436 F. Supp. 51, 56-57, *aff'd without op.* (1978), 574 F.2d 636; see *Associates Capital Services Corp.*, 454 F. Supp. at 834 (no utilization of industry contracts or use of mailing lists).) Specifically, if potential buyers are identified and not advised of the auction, then there is a breach of duty by the secured party. *Savage Construction, Inc.*, 102 Nev. at 39, 714 P.2d at 576.

In this case, Boender purchased the collateral at the UCC sale for approximately $155,000 when he knew he had an executed contract for sale of that collateral for a price six times the amount that he, the secured creditor and sole bidder, bid in. Indeed, based upon this contract, Boender is alleged to have resold the property the next day for $950,000 thereby receiving nearly $800,000 in profit for himself. We note that if these alleged facts are proven at trial, Boender clearly violated the UCC requirement of commercial reasonableness. This conduct obviously constitutes self-dealing, which is prohibited. Boender, under these alleged facts, was unable to actually sell the collateral to any third party at the public sale without incurring liability to Unity Church on their contract; therefore, he had a vested interest in preventing the sale of the collateral to a third party. It is difficult to imagine a factual situation where self-dealing by the secured creditor is more apparent.

Indeed, most cases in which a sale has been held commercially unreasonable have less egregious facts than those alleged here. For example, in *Savage Construction, Inc.* (102 Nev. 34, 714 P.2d 573), a sale was held commercially unreasonable because the secured creditor

had negotiated with a potential purchaser for the sale of its debtor's collateral before the public sale, but failed to notify that same party of the public sale so that it could bid. The secured creditor purchased its debtor's collateral at the public sale for $158,000 and subsequently resold it a few weeks later for $193,000 thereby receiving a $35,000 profit. See *Savage Construction, Inc.*, 102 Nev. at 38, 714 P.2d at 574.

Boender's argument, with which the circuit court agreed, that his UCC sale of collateral was separate and distinct from the subsequent sale, ignores Clubhouse's claim that the UCC sale, in and of itself, lacked commercial reasonableness by virtue of the fact that the value of the property already had been established by the sales contract in Boender's possession, revealing the unconscionable disparity between Boender's knowledge of the property's market value and his bid.

■■ In addition, Clubhouse alleged that the notice published in the Chicago Daily Law Bulletin was inadequate because the collateral involved was uniquely improved realty and such notice did not reach its market. Where by failing to advertise in a manner that will engender competitive bidding the secured party insures an opportunity for self-dealing, a court must scrutinize the sale closely. (*Kobuk Engineering & Contracting Services, Inc.*, 568 P.2d at 1011; *Savage Construction, Inc.*, 102 Nev. at 36, 714 P.2d at 575.) The ads should be reasonably directed to potential bidders in order to encourage interest. (*Foster*, 84 Wash. 2d at 549, 527 P.2d at 1114; *Leasing Service Corp.*, 545 F. Supp. at 368; *Connex Press, Inc.*, 436 F. Supp. at 55.) Where no one attends the public auction except the secured creditor, improper notice of the public auction may be inferred. *Savage Construction, Inc.*, 102 Nev. at 38, 714 P.2d at 575.

In the present case, the quality of the advertisement is questionable given the alleged surrounding circumstances. This case is closely analogous to *Kobuk Engineering & Contracting Services, Inc.* (568 P.2d 1007). In that case, the court held a sale commercially unreasonable where the secured party, which was the sole bidder at public auction, purchased equipment for $10,000 and then resold it six weeks later for $25,000. The secured party had posted notices of the sale in public offices. The court closely scrutinized the sale because the secured party there had the opportunity for self-dealing. The court also held that the limited scope of notice of the public sale was of particular importance because the secured party itself purchased the collateral at the UCC sale. *Kobuk Engineering & Contracting Services, Inc.*, 568 P.2d at 1011.

Boender maintains that the sale factually was commercially reasonable. Whether a sale was commercially reasonable ordinarily is a

question of fact. The reasonableness at issue here was decided on the pleadings. The appropriate standard of review in this case is whether Clubhouse's claim sufficiently states a cause of action. Boender's argument goes beyond the scope of our review.

 ■ Clubhouse also contends that its second amended counterclaim states a cause of action under section 9—504 for Boender's violation of the reasonable notification requirement (Ill. Rev. Stat. 1991, ch. 26, par. 9—504(3)). This is so, it asserts, because of the requirement in the notice that *"[p]rior to the bidding, each bidder shall submit a Cashier's Check for $50,000 *** payable to Seller."* Section 9—504(3) provides that the secured party shall give "reasonable notification of the time and place of any public sale" to the debtor. In *Wilmington Trust Co. v. Conner* (Del. 1980), 415 A.2d 773, 776, the court noted:

> "The purpose of the requirement of 'reasonable notification' is threefold: (1) it gives the debtor the opportunity to exercise his redemption rights under §9—506 [citation]; (2) it affords the debtor an opportunity to seek out buyers for the collateral [citation]; and (3) it allows the debtor to oversee every aspect of the disposition, thus maximizing the probability that a fair sale price will be obtained [citation]. Any aspect of the notice that is contrary to these purposes necessarily prevents it from being 'reasonable notification.' "

(See also *Korogluyan v. Chicago Title & Trust Co.* (1991), 213 Ill. App. 3d 622, 631, 572 N.E.2d 1154.) The reasonableness of notice is usually a question of fact. (See *Baber v. Williams Ford Co.* (1965), 239 Ark. 1054, 1056, 396 S.W.2d 302, 304-05; *Bondurant v. Beard Equipment Co.* (Fla. Dist. Ct. App. 1977), 345 So. 2d 806, 809.) Whether Boender's requirement that all prospective bidders submit cashier's checks in advance of the bidding denied Clubhouse the fulfillment of any of the purposes set forth in *Conner*, particularly points (2) and (3) in the quoted portion of the opinion, apparently was decided as a matter of law by the circuit court. This was error.

For the foregoing reasons, the dismissal of the second amended counterclaim was error which requires reversal.

## IV

Clubhouse claims that a secured creditor, who purchases his debtor's collateral at a commercially unreasonable UCC sale and then

subsequently resells the collateral, is liable to the debtor for the surplus under UCC section 9—504(2).[2]

■■■ Section 9—504(2) provides in part: "If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for the deficiency." (Ill. Rev. Stat. 1991, ch. 26, par. 9—504(2).) In support of its position, Clubhouse cites *A to Z Rental, Inc. v. Wilson* (10th Cir. 1969), 413 F.2d 899, *Vic Hansen & Sons, Inc. v. Crowley* (1973), 57 Wis. 2d 106, 203 N.W.2d 728, *General Foods Corp. v. Hall* (1976), 39 Ill. App. 3d 147, 349 N.E.2d 573, and *Morris Plan Co. v. Johnson* (1971), 133 Ill. App. 2d 717, 271 N.E.2d 404. Each of these cases is distinguishable from the case at hand, however, because they are actions for claimed deficiencies, which section 9—504(2) is meant to address. (See *First Galesburg National Bank & Trust Co. v. Joannides* (1984), 103 Ill. 2d 294, 469 N.E.2d 180.) Clubhouse's second amended counterclaim fails to request damages correctly, and the circuit court's decision must be affirmed in that regard.

Nevertheless, Clubhouse otherwise may rely upon part 5 of article 9 of the UCC, which provides for recovery of damages. The Official Code Comment observes that the purpose of section 9—507(1) is to provide remedies to the debtor when the secured creditor proceeds with the sale of collateral in a commercially unreasonable manner. (See 9 R. Anderson, Uniform Commercial Code §9—507(1), at 823 (3d ed. 1985).) The debtor has the right under section 9—507(1) to recover for "any loss caused by a failure to comply" with section 9—504's requirement that the disposition of the collateral be made in a commercially reasonable manner. (*United States v. Conrad Publishing Co.* (8th Cir. 1978), 589 F.2d 949, 955; *Sheffield Progressive, Inc. v. Kingston Tool Co.* (Mass. Ct. App. 1980), 405 N.E.2d 985, 988.) The debtor may recover monetary damages. See *Transport Equipment Co. v. Guaranty State Bank* (10th Cir. 1975), 518 F.2d 377 (court assessed monetary damages against secured party for conducting a sale in a commercially unreasonable manner).

Although the secured creditor has the burden of proving commercial reasonableness, where the debtor is proceeding against the secured party under section 9—507(1) for failure to conduct a commercially reasonable sale, the debtor must carry the burden of proving the amount of that loss. (*Transport Equipment Co.*, 518 F.2d at 384.)

---

[2]Clubhouse refers in its brief to section 9—504(e), not section 9—504(2). The UCC does not contain a section 9—504(e). It appears from Clubhouse's argument that it meant to refer to section 9—504(2).

The price received at a subsequent sale to a third party is an indicator of fair market value. (*Liberty National Bank & Trust Co. v. Acme Tool Division of the Rucker Co.* (10th Cir. 1976), 540 F.2d 1375, 1381; *Savage Construction, Inc.*, 102 Nev. at 38, 714 P.2d at 575; see also *Connex Press, Inc.*, 436 F. Supp. at 58; *Spiller v. First National Bank* (1982), 109 Ill. App. 3d 1100, 1104, 441 N.E.2d 872.) We note that an executed contract held on the date of the UCC sale is also representative of the fair market value.

Affirmed in part; reversed in part and remanded.

McCORMICK and DiVITO, JJ., concur.